

**FILED**

AUG 3 1 2018

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | **CRIMINAL NO.  18-   (ABJ) -260** |
| | * | |
| **v.** | * | **Violation:  22 U.S.C. §§ 612 and** |
| | * | **618(a)(1)** |
| | * | |
| **SAMUEL PATTEN,** | * | **(Foreign Agents Registration Act)** |
| | * | |
| **Defendant.** | * | |
| | ****** | |

### STATEMENT OF THE OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, the National Security Division of the U.S. Department of Justice, and the defendant W. SAMUEL PATTEN (PATTEN) stipulate and agree that the following facts are true and accurate. These facts do not constitute all of the facts known to the parties concerning the charged offense and covered conduct. This statement is being submitted to demonstrate that sufficient facts exist to establish that the defendant committed the offense to which he is pleading guilty.

### Count 1—Foreign Agents Registration Act (22 U.S.C. §§ 612 and 618(a)(1))

1.      Beginning in or around 2014 to the present, PATTEN worked with a Russian national (Foreigner A) on lobbying and political consulting services. The two formed a company (Company A) in the United States, and were 50-50 partners. Beginning in or around 2015, Company A, among other things, advised the Opposition Bloc (a Ukrainian political party) and members of that party, including a prominent Ukraine oligarch (Foreigner B). Company A performed political consulting services, which involved work within Ukraine as well as lobbying in the United States. As part of Company A's work, PATTEN travelled to Ukraine on numerous



WSP
8-31-18

occasions, and met with Foreigners A and B, and other foreigners.  For this work, Foreigner B caused payments to be made to Company A through an offshore Cypriot account.  From in or around the spring of 2015 through in or around 2017, Company A received over $1,000,000 for its work for the Opposition Bloc and other Ukraine consulting work, a portion of which was received as a result of conduct which violated the Foreign Agents Registration Act.

2.      As part of his work for Company A, PATTEN violated the Foreign Agents Registration Act by contacting members of the United States legislative and executive branches as well as the media.  Such communications included efforts to set up meetings between Foreigners A and B with Members of Congress and staff, without disclosing that he was an agent of the Opposition Bloc.  PATTEN also drafted talking points for Foreigner B for his meetings on Capitol Hill as well as talking points for Congressional staffers to use to convince other Congressional Members and staff to meet with Foreigner B.  The activity was undertaken to promote the interests of Foreigner B and influence United States policy.  In addition, during this time period, PATTEN and Foreigner A assisted Foreigner B in drafting periodic articles (e.g. "op eds") targeted at the United States press, without disclosing that he was an agent of the Opposition Bloc.

3.      Specifically, PATTEN in coordination with Foreigner A worked on setting up meetings in Washington, D.C., from on or around January 19, 2015 through on or around January 21, 2015, between Foreigner B and (a) Members of Congress and their staff – specifically, Senators on the Foreign Relations Committee and Representatives on the House Committee on Foreign Affairs; (b) the Executive Branch – including officials from the U.S Department of State; and (c) numerous members of the United States media.  PATTEN also drafted and provided staffers with points of discussion concerning Foreigner B and his message with respect to Ukraine.  As another example, in or around May 2016, PATTEN and Foreigner A wrote a letter for Foreigner B to use in lobbying


WSP
8-31-18

a high-ranking member of the Department of State regarding recent developments on the Ukrainian Central Election Commission, and requested the official's engagement on the issue. Again, PATTEN did not disclose to the Department of State representative or the Department of Justice that he was working as an agent for the Opposition Bloc.

4.      PATTEN also drafted op-ed pieces on behalf of Foreigner B and then placed them with United States media. For instance, in or around January 2017, PATTEN and Foreigner A drafted an op-ed article on behalf of Foreigner B to address concerns regarding Ukraine's ability to work effectively with the new United States administration. PATTEN then attempted to get the op-ed article placed with various United States media outlets. In or around February 2017, PATTEN successfully got the op-ed article published in a national United States media outlet. Prior to the publication of the op-ed, PATTEN facilitated Foreigner B's signing the required United States media outlet's license agreement.

5.      PATTEN knew at the time that he took all of the actions described above that the Foreign Agents Registration Act required him to register in order to engage legally in such United States activities for a foreign principal. PATTEN had previously filed under the Foreign Agents Registration Act for another client. PATTEN and Foreigner A inquired of Foreigner B whether Company A could file under the Foreign Agents Registration Act; Foreigner B said in substance that he did not want them to register now, but they could eventually do so at an unspecified future date. As a result, PATTEN and Foreigner A never filed, timely or not, and continued to work for and represent the Opposition Bloc and members of that party, including Foreigner B.

### Other Conduct

**Causing and Concealing Foreign Payments**

6.      In January 2017, Foreigner B sought to attend the Presidential inauguration. Foreigner A



contacted PATTEN to find out if PATTEN could obtain tickets for Foreigner B.  PATTEN was aware at the time that the Presidential Inauguration Committee (PIC) could not accept money from foreign nationals.  PATTEN had contacted an intermediary who sent PATTEN a communication in writing on behalf of the PIC that it could not accept money from foreigners, but foreigners could attend the event so long as they did not provide the funds.  That communication was shared with Foreigner A.  PATTEN was also provided by the intermediary the PIC "Underwriter Response Form" which stated that "[c]ontributions from foreign nationals, including foreign corporations are prohibited" and had a check box next to the certification that stated "I am not a foreign national…"

7.     To circumvent the foreign donation restriction, PATTEN, with the knowledge of Foreigner A, solicited a United States citizen to act as a "straw" purchaser so that he could conceal from the PIC that the tickets for the inauguration were being paid for from a foreign source.  The straw purchaser paid $50,000 for four inauguration tickets.  The straw purchaser paid that sum one day after receiving from Company A a check signed by PATTEN in the sum of $50,000.  In turn, Foreigner B had paid Company A for the tickets through a Cypriot account.  Foreigners A and B, another Ukrainian, and PATTEN were allocated the four inauguration tickets.  Thereafter, PATTEN attended a PIC event in Washington, D.C. with Foreigner B.

**Withholding Documents; False/Misleading Testimony**

8.     In or about January 2018, the United States Senate Select Committee on Intelligence (SSCI) sought PATTEN's voluntary testimony on various topics.  In advance of that testimony, the SSCI sought various pertinent documents from PATTEN.

9.     In or about January 2018, PATTEN testified before the SSCI.  Both before and during his testimony, PATTEN misled the SSCI in that he intentionally did not provide SSCI certain


WSP
8-31-18

documents that could lead to revelation of him causing and concealing the foreign purchase of the

PIC tickets, described above, and gave false and misleading testimony to avoid disclosing that he

had caused and concealed foreign money to be paid to the PIC.  In addition, PATTEN provided

misleading testimony about his representation of foreign principals in the United States, so as to

conceal his violation of the Foreign Agents Registration Act.  Finally, after the interview, PATTEN

deleted documents pertinent to his relationships with the above-described foreign principals.


JESSIE K. LIU
United States Attorney


By:

Michael C. DiLorenzo
Assistant United States Attorney

Scott A. Claffee
Trial Attorney
U.S. Department of Justice
National Security Division



## DEFENDANT'S ACCEPTANCE

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crime charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

I have read every word of this Statement of the Offense or have had it read to me. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorneys, I agree and stipulate to this Statement of the Office, and declare under penalty that it is true and correct.

Date: 8-31-18

W. Samuel Patten
Defendant

## ATTORNEY'S ACKNOWLEDGEMENT

I have read this statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate.

Date: 8/31/18

Stuart A. Sears, Esq.
Attorney for the Defendant