**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **v.** ) | **Case No. 1:18-CR-00260-ABJ** |
| ) | |
| **W. SAMUEL PATTEN,** ) | |
| ) | |
| **Defendant.** ) | |

## DEFENDANT W. SAMUEL PATTEN'S MEMORANDUM IN AID OF SENTENCING

### I.   INTRODUCTION

On April 12, 2019, defendant W. Samuel Patten will appear before this Court to be sentenced for the offense of failing to register under the Foreign Agents Registration Act ("FARA"), 22 U.S.C. §§ 612 and 618.   As this Court will see, however, this case is unlike other FARA cases brought by either the Special Counsel's Office ("SCO") or other U.S. Attorney's offices around the country.   Mr. Patten was never hired to lobby U.S politicians or to advocate for or against any specific U.S. policy.   Mr. Patten did not create or hire intermediaries for the purpose of concealing from the American public or government his work on behalf of a foreign client.   He did not charge exorbitant fees to advance his client's causes and did not hide his assets around the globe and far away from the IRS.   And perhaps most importantly for a FARA case, he never concealed who his clients were.   Instead, during the course of a long business relationship where Mr. Patten advised his clients on matters related solely to Ukrainian politics and elections, he did a few favors for his clients that crossed the line into FARA-registrable activity.

Mr. Patten understands that this Court must affix a punishment sufficient but not greater than necessary to comply with the stated purposes of federal sentencing.   He asks the Court, in

fashioning his sentence, to recognize that his crimes were not motivated by greed or a desire to conceal relevant information from the American public or to aid or cover up any potential interference with the 2016 Presidential election.  To the contrary, Mr. Patten's decisions in this case stemmed primarily from a desire to accommodate his clients' requests and to present himself in the best possible light after unexpectedly finding himself a subject of the Russian interference investigation.  He at times also made choices that were too heavily influenced by his loyalty to friends, clients, and his own self-interests.

Mr. Patten's actions were inconsistent with his character and moral standards.  He violated the very principles he long has advocated for in the United States and abroad – honesty, integrity and transparency.  Importantly, however, when eventually approached by the Special Counsel's Office, Mr. Patten admitted his offenses and took full responsibility for his actions.  He agreed to cooperate with the ongoing investigation without any guarantee of how his own potential case would be resolved.  And, over the course of that cooperation, which will be described in sealed pleadings, Mr. Patten earned the trust of the government and became a reliable and valuable resource.  For those reasons, and the ones that follow, we respectfully ask this Honorable Court to impose a probationary sentence that will allow Mr. Patten to continue on the progress he has made since his August 2018 guilty plea and continue to contribute to his family, community and country.

## II.  MR. PATTEN'S PLEA AGREEMENT

Mr. Patten pled guilty on August 31, 2018, to a one-count criminal information charging him with violating FARA.  The plea agreement was the result of extensive meetings and negotiations with the SCO and later with the United States Attorney's Office for the District of Columbia.  Under the terms of the agreement, both the United States and Mr. Patten agreed that

the United States Sentencing Guidelines ("U.S.S.G.") do not apply to a FARA violation and that because there is no analogous guideline provision, the 18 U.S.C. § 3553 sentencing factors exclusively guide the Court's sentencing considerations.  The probation office likewise concluded that there is no applicable guideline and, therefore, "an advisory guideline range could not be determined for this offense." *See* Presentence Investigation Report ("PSR") ¶83.  Under the terms of the plea agreement, this Court is free to sentence Mr. Patten to a period of probation without any active term of incarceration.  *Id.* ¶77; *see also* Plea Agreement (Dkt. # 6) at 6, #10 ("Defendant will then be free to argue for any sentence within the statutory range, including probation. Depending on the precise nature of the defendant's substantial assistance, this Office may not oppose defendant's application.").

### III.    THE 18 U.S.C. § 3553 SENTENCING FACTORS

Section 3553 requires district courts to consider the following factors in imposing sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victim(s).  18 U.S.C. § 3553(a)(1)-(7).  The end result of the analysis must be a sentence that is "sufficient, but not greater than necessary" to comply with four purposes of federal sentencing, i.e., the need for the sentence imposed (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  For the reasons that follow, a sentence of

probation is "sufficient but not greater than necessary" to serve the purposes of federal sentencing under the circumstances of this case.

### 1.      The Nature and Circumstances of Mr. Patten's Offenses

The nature and circumstances of Mr. Patten's offense is recounted in the Statement of Facts (Dkt. #7) as well as in the PSR.  (*See* PSR ¶¶7-15).  While the facts constituting Mr. Patten's offense need no repetition, it may assist the Court in fashioning a sentence, to better understand the additional facts, circumstances and motivations surrounding Mr. Patten's conduct.  Although these additional factors might provide an explanation for his conduct they do not excuse or mitigate the seriousness of the decisions Mr. Patten made at various times over the past several years. Instead, this information is offered for the sole purpose of providing the Court with greater context from which to evaluate Mr. Patten's actions.  In sum, it is intended to help the Court understand why and how Mr. Patten, who has lived an honorable life marked by substantial contributions to furthering his country's interests, finds himself a part of one of the largest and most high-profile investigations in our country's history and, ultimately, before a federal judge for sentencing.

### *a.   The FARA violation*

As explained in the introduction, Mr. Patten's relationship with Foreigner B and the Opposition Bloc did not contemplate any work that would be considered lobbying in the United States.  Instead, Mr. Patten's engagement required him to assist and advise his clients with regard to Ukrainian politics and elections.  Typically, this work involved drafting polling questions and interpreting polling data to predict and prepare for the issues and opinions driving the political climate in Ukraine.  Mr. Patten would explain the significance of the polling data and would propose ways in which his clients could shape their message to align with the public attitudes and

issues that would dominate the political cycle.  In sum, Mr. Patten was hired to be a political consultant in Ukraine, not a lobbyist, and certainly not to lobby any U.S. officials.

Over time, however, his clients infrequently asked for help in drafting or editing speeches, talking points, or op-eds.  For example, Foreigner B, through Mr. Patten's former business partner, Konstantin Kilimnik, asked Mr. Patten to draft a letter to a Department of State official regarding Ukraine's Central Election Commission.  Mr. Patten helped draft and edit the letter but the letter itself was sent by Foreigner B directly – not Mr. Patten.  Therefore, although Mr. Patten's involvement with the letter required him to register for this type of assistance, his failure to do so did not, unlike traditional FARA nondisclosures, conceal the foreign national/entity looking to contact or arguably influence a U.S. official.

Additional examples can be found in the limited instances where Mr. Patten was asked to help arrange a meeting between Foreigner B and Congressional staffers while Foreigner B was visiting the United States.  In all, Mr. Patten's efforts consisted of sending a few emails to friends on the Hill explaining why a meeting with Foreigner B was worthwhile and drafting talking points for the scheduled meetings.  It was clear to anyone who received those emails that Mr. Patten was proposing a meeting on Foreigner B's behalf because the meeting was going to be with Foreigner B himself, not Mr. Patten.  Therefore, like the previous example involving the Department of State official, Mr. Patten's brief contacts violated the letter of FARA but not the spirit.  As the SCO has noted, "[t]he purpose of FARA is to ensure the United States government and the United States people are *informed of the identity of foreign entities*…behind information or propaganda being used to influence public opinion, policy and laws."  *See* Government's Memorandum in Aid of Sentencing, *United States v. Michael T. Flynn*, Case No. 1:17-cr-00232-EGS (Dkt. #46) at 4 (emphasis added).

To be sure, Mr. Patten knew better and should have taken his FARA responsibilities more seriously.[1]  It is no excuse that the government historically has been reluctant to enforce FARA's criminal penalties.  It is likewise no excuse that the FARA statute is, by the government's own description, "esoteric."  *See* Government's Memorandum in Aid of Sentencing, *United States v. Paul J. Manafort, Jr.*, Case No. 1:17-cr-00201-ABJ (Dkt. #525) at 1.  However, it is relevant to this Court's sentencing analysis whether Mr. Patten sought to conceal his client from the government for some improper reason, which was not the case.  It is also relevant that unlike many of the more recent FARA prosecutions, of which this Court is well aware, Mr. Patten did not create companies or entities to hide who he was working for or to conceal foreign influence.  *See id*. at 10 ("Secrecy was integral to the effectiveness of the foreign lobbying Manafort orchestrated…; compliance with FARA would have revealed the deceptive tactics Manafort and his Ukraine client were using to lobby in the United States.").   There was no such deception in Mr. Patten's case as Foreigner B's identity was fully known, Foreigner B was the named author of any op-eds, and Foreigner B himself attended any scheduled meetings.

### b.  Foreign Payments to the Presidential Inauguration Committee

As this Court is aware from the "other conduct" section of the Statement of Offense (Dkt. #7), Mr. Patten arranged a payment from an American business in order to conceal that a Ukrainian national was the true purchaser of four tickets to the 2017 Presidential Inauguration festivities.  Like the facts giving rise to his FARA violation, Mr. Patten should have simply turned down his client's request.  Instead, in order to accommodate his client and to demonstrate his ability to

---

[1] Mr. Patten was familiar with FARA as he had previously registered under FARA for work performed on behalf of a different client.  That work, unlike Mr. Patten's role in the instant case, included Mr. Patten's personal attendance and involvement at meetings intended to influence U.S. officials.

deliver when needed, Mr. Patten, who was working in Africa at the time, arranged for the payment to come from an intermediary located in the U.S., whom he later reimbursed.

Mr. Patten recognizes the importance of prohibiting foreign contributions to the Presidential Inauguration Committee ("PIC"). He simply did not think long enough or clearly enough about the significance of his decision at the time he made it. He knew, for example, that foreigners routinely attend inaugurations. He also knew that one of the Ukrainian politicians who would attend had previously attended President Obama's inauguration. In Mr. Patten's mind, these were tickets to a post-election party and not an attempt to influence an election or politician. More importantly, he was blinded by a desire to accommodate his client. While the above explains why Mr. Patten did what he did it provides no justification for his decision. It was a complete breakdown in judgment and Mr. Patten regrets his involvement with the inauguration tickets.

Unlike the narratives being pushed by some media outlets, however, Mr. Patten's involvement in the purchase of the PIC tickets was not motivated by a desire to "funnel" foreign money to the Trump campaign. For starters, Mr. Patten did not support the Trump campaign and while he may have known people who worked for the campaign at various times, he had no personal connection to it. Indeed, Mr. Patten not only openly opposed the Trump candidacy but even broke with his party when he voted for President Trump's opponent in the 2016 presidential election. To the extent it matters to the Court, there was no political agenda or motive behind Mr. Patten's role in the purchase of the inauguration tickets. It was entirely the product of a wrong-headed effort to accommodate a client's request. And as the Court has seen, Mr. Patten's failure to think through the full ramifications and significance of his acts also led to his issues with the United States Senate Select Committee on Intelligence ("SSCI").

<em>c.  Incomplete Production and Senate Testimony</em>

Mr. Patten's involvement in the alleged Russian interference investigation began innocently enough when he received SSCI's September 22, 2017 letter asking him to *voluntarily* produce several categories of documents. Mr. Patten opted to respond to the request despite the fact he had not been subpoenaed and was not under any other obligation to provide the requested information. He also decided, regrettably, to respond to the SSCI request without first seeking the advice of a lawyer. Believing he had little connection to SSCI's investigation, he decided to handle it alone. Therefore, he did not benefit from a lawyer's advice on (1) whether to produce documents voluntarily, (2) whether to limit the scope of the request, (3) whether to seek immunity for any potential criminal exposure, (4) how to search for responsive documents, (5) how to produce any responsive documents, and (6) how best to preserve responsive and/or produced documents.

As a result, Mr. Patten made several mistakes during the search and production process. He searched too narrowly and did not concern himself with providing *every* email or document, such as attachments to emails and word or pdf documents. He also failed to retain his own copy of what had been produced in the event there was ever a dispute over the production. More importantly, he allowed his concerns about the potential leaking of his business emails to influence what he produced.[2] He also withheld a few documents that could have implicated his friends and/or clients in the purchase of the PIC tickets.

---

[2] Prior to his production, emails between Kilimnik and Manafort had been leaked to the Washington Post and possibly other publications. There was reason for Mr. Patten to believe that his production would not be kept confidential. As it ultimately turned out, Mr. Patten's concerns were well-founded, even if misplaced. As this Court is aware, SSCI's Director of Security, James Wolfe, the very person to whom Mr. Patten delivered his production, pled guilty to lying to the FBI about his sharing of confidential SSCI information with reporters. The Honorable Ketanji Brown-Jackson sentenced Mr. Wolfe to serve a two-month term of incarceration. *See United States v. James A. Wolfe*, Case No. 1:18cr00170-KBJ.

It is important to note, however, that even though his production was not as fulsome as it should have been, Mr. Patten did produce over 1,300 pages of documents to SSCI, including communications he had with U.S. officials on behalf of Foreigner B.  He also produced emails that clearly established that he had helped draft talking points and op-eds for Foreigner B.   Moreover, he produced materials that documented Kilimnik's and Foreigner B's travel to the United States for the inauguration as well as efforts to purchase tickets to the National Prayer Breakfast.  So, while Mr. Patten wrongly withheld some documents, he also *voluntarily* provided SSCI with materials that incriminated him.

Regarding Mr. Patten's subsequent voluntary closed-door interview with SSCI, it would be fair to conclude that Mr. Patten minimized his contacts with U.S. officials on behalf of foreign clients.  However, this portion of his questioning was confusing, primarily because his attorney at the time and SSCI staff had reached a pre-interview agreement not to discuss areas that might implicate FARA issues.  Mr. Patten's former attorney communicated to SSCI that he did not have any experience with FARA and would need to delay the interview in order to educate himself and to determine whether Mr. Patten had any exposure.  As a result, SSCI staff agreed to avoid questions about FARA related activities.  Nevertheless, the Committee staff still raised FARA issues and Mr. Patten's answers were arguably misleading in that they may have given the impression that he had not done "any work" in the United States on behalf of foreign clients.  Again, Mr. Patten had previously registered under FARA on behalf of another client and many of the documents Mr. Patten had voluntarily produced two months prior to his interview clearly established the opposite so there was little reason for Mr. Patten to deny *any* contacts or "work" in the United States.  While Mr. Patten's testimony on this point is perhaps best attributed to a

misunderstanding, he acknowledges that his answers could have been clearer and that he could have volunteered more information than what he provided.

Finally, as to this issue, Mr. Patten admittedly erred when he deleted his email archive folder on or about March 2, 2018, without first seeking SSCI's permission. SSCI's original letter requesting the voluntary production of documents also asked Mr. Patten to preserve any and all responsive documents. Mr. Patten responded to that letter with his production on October 31, 2017. Approximately two months after his voluntary production, the Committee contacted Mr. Patten in order to arrange a voluntary in-person interview. At that time, Mr. Patten retained counsel to assist with the interview process and the Committee provided Mr. Patten's former counsel with approximately 100 emails that it intended to raise during the interview. Mr. Patten's voluntary interview occurred on or about January 5, 2018 and lasted five hours.

Approximately two months later, in March 2018, Mr. Patten's laptop began to malfunction and he was having difficulty completing basic tasks. Mr. Patten believed it was a memory issue related to his Gmail account so on or about March 2, 2018, Mr. Patten manually deleted his Gmail archive folder, which contained approximately 200,000 emails. Regrettably, although Mr. Patten believed he had fulfilled his obligations to the Committee, he did not consult with his previous attorney or the Committee prior to the deletion of his archived emails. Having produced responsive documents and having submitted to a voluntary interview, Mr. Patten incorrectly believed that he was free to delete his emails. He understands now that he should not have done so without, at a minimum, the Committee's approval.[3]

---

[3] Mr. Patten, through undersigned counsel, retained a data management company in order to attempt to recover the deleted materials. He also devoted a substantial amount of his own time working on responses to the Committee's follow-up subpoena and recreating his business meetings for the past three years. Mr. Patten has spent more than $10,000 in an effort to recover the deleted data alone. It was not Mr. Patten's intent, in March 2018, to frustrate the Committee's

The Court now has additional facts surrounding Mr. Patten's offense conduct including that to which he pled guilty and that which was included as "other conduct" in his Statement of Offense.  The facts outlined above are presented so that the Court has a more complete picture of Mr. Patten's conduct and intent.  It is also important, however, for the Court to consider how Mr. Patten's conduct compares to the way he has lived his life and whether, and to what extent, his personal history and characteristics should factor into this Court's punishment.

### 2.        History and Characteristics of Mr. Patten

Section 3553(a) "requires courts to take into account relevant facts to a defendant's history and characteristics," such as a defendant's lack of criminal history, age, efforts at rehabilitation and efforts to cooperate with the government.  *United States v. Delaney*, 651 F.3d 15, 20 (D.C. Cir. 2011) (*internal citations omitted*).  In addition, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *Id.*  18 U.S.C. § 3661; *see United States v. Anderson,* 632 F.3d 1264, 1270 (D.C. Cir. 2011) (citing 18 U.S.C. § 3661; *United States v. Tucker,* 404 U.S. 443, 92 S. Ct. 589, 30 L.Ed.2d 592 (1972)).

Mr. Patten's history and characteristics weigh heavily in favor of a probationary sentence. As detailed below, Mr. Patten has no prior criminal history and has served his country by advancing American principles, values and ideals in difficult circumstances and dangerous locations around the world. Those who know Mr. Patten, whether by blood, friendship, or employment, uniformly regard him as a principled, inclusive, thoughtful and caring individual.

---

investigation.  To the contrary, Mr. Patten fully believed at that time that the Committee's interest in him and his documents had concluded.

He is not only an asset to his immediate community, but he has been an asset to the United States' interests overseas.  Moreover, and as will be detailed in under seal filings, Mr. Patten has been a valuable asset to the SCO and the U.S. Attorney's office in relation to several ongoing investigations.

### a. Background

Mr. Patten was born in 1971, in Washington D.C.  He was raised in Massachusetts and Maine, where he graduated from Camden-Rockport High School.  His father, Bill Patten, was a local newspaper publisher and his mother, Kate Bacon, worked as a social worker.  They divorced in 1987 and are both re-married and retired.  Mr. Patten has two younger sisters who live in California.

Mr. Patten graduated from Georgetown University in 1993 with a major in American Government and a minor in International Relations.  While at Georgetown, he was actively involved in student life and politics and helped co-found a support hotline for sexual assault survivors as well as an alternative political newspaper.  It was also during his time at Georgetown that Mr. Patten began his life in politics when he interned for Senator William Cohen (ME), Congress Joe Brennan (ME), and British Member of Parliament Dudley Fishburn, who wrote a letter to the Court on Mr. Patten's behalf (Exhibit 1).[4]  Mr. Patten also volunteered for the D.C. Public Defender's Service as an investigator.

Following graduation, Mr. Patten returned home to Maine where he spent a year working as a reporter for his father's newspaper, the Camden Herald.  In 1994, he returned to politics by working on two state political campaigns (congressional and gubernatorial).  In 1996, he worked

---

[4] All of the character letters submitted on Mr. Patten's behalf have been consolidated as Exhibit 1.

as the finance director for Susan Collins' successful campaign for the Senate seat she still holds today.  It was also around this time that Mr. Patten began a lifelong connection to Eastern Europe and the former Soviet Republics.

From 1995 to 1999, apart from his stint with the Collins campaign, Mr. Patten lived and worked in Kazakhstan.  He first worked as a teacher but later transitioned to public and government relations work for several international companies that operated there.  It was in Kazakhstan that Mr. Patten met his first wife, Aizhan, learned basic Russian, and fathered his only child.

In 1999, Senator Collins hired Mr. Patten to run her Portland office and later to be her foreign affairs and defense legislative assistant.  In 2000, Senator Collins recommended Mr. Patten to the Bush-Cheney campaign as a state coordinator.  Following the Bush campaign, Mr. Patten left his job in the Senate to join the International Republican Institute ("IRI") as the democracy group's Russia program officer, and later resident country director in Moscow until 2004.  While serving in Russia, Mr. Patten also re-opened IRI's Kazakhstan operation.

From 2004 to 2005, Mr. Patten worked for IRI to promote democracy in Iraq in the period leading up to their 2005 elections. From 2005 to 2007, Mr. Patten worked for a Washington-based political consulting firm for whom he managed a number of international assignments, which he interrupted to take a speechwriting position with Maine Senator Olympia Snowe from 2005 to 2006.  In 2008, Mr. Patten was appointed as Senior Advisor for Democracy and Global Affairs to Under Secretary of State Paula Dobriansky.  He became her speech writer and was responsible for helping her promote democracy around the world including coordinating the work of Secretary Condoleeza Rice's Advisory Committee on the Promotion of Democracy.

His appointment at the State Department ended with the Bush administration and he subsequently founded his own political consulting firm and took on a number of special

assignments.   Among those assignments, Mr. Patten became the Eurasia program director for Freedom House from 2009 to 2011.   Among other duties, Mr. Patten was responsible for promoting freedom of expression, human rights and adherence to the Organization for Security and Co-operation in Europe commitments for the countries of Eastern Europe and the former Soviet Union, with a special emphasis on Central Asia.[5]

In 2014, he joined with Konstantin Kilimnik, a friend since 2001 and a former IRI co-worker, to form a political consulting firm focused primarily on Ukraine but with an eye towards expanding to other former Soviet republics and foreign countries.   It was Mr. Patten's work and relationship with Kilimnik, primarily during the time period they worked for Foreigner B, that made Mr. Patten of any interest to SSCI and the SCO.   Despite the more recent speculation and revelations, at no point did Mr. Patten know, believe, or suspect that Kilimnik was connected in any way to Russian intelligence.

b.   *Personal Characteristics*

Mr. Patten has lived a life focused on improving the lives of those around him as well as spreading the democratic principles he believes in to faraway places.   The letters submitted on Mr. Patten's behalf paint a clear and reliable picture of a self-less friend, family member, citizen, and patriot, who has always put others and the causes he has advanced before his own safety and needs. He has never been motivated by greed or a desire to be wealthy.   What drives him is the opportunity to bring real change to the people and parts of the world he believes desperately need it.

---

[5] This work included advocacy on behalf of political prisoners and dissidents in repressive regimes as well as promoting respect for human rights as a means of countering the stigma of ethnic violence.  The State Department subsequently awarded Freedom House a $250,000 grant to engage in post-genocidal work in Kyrgyzstan, which Mr. Patten implemented on the ground.

As Mr. Patten's ex-wife, Aizhan, writes to the Court, Mr. Patten's chosen overseas assignments were "far from lucrative" and often "quite dangerous." Exhibit 1 (Letter from Aizhan Kulakhmetova Patten). He often represented opposition parties and candidates that were "blacklisted by local despots." He has a soft spot for movements against corrupt regimes and as his wife Laura writes, he "so passionately believes in giving voice to the voiceless, that I lost track of how many times he accepted pro-bono clients."[6] Exhibit 1 (Letter from Laura Patten). One such experience that has had a long-lasting impact on Mr. Patten's life was his work in Iraq around the time of the country's first post-invasion elections in 2005. Mr. Patten's friend, Dr. Ahmed Al-Nagr, best summarizes his impression of Mr. Patten's contributions to his country as follows:

> In my short time working with Sam directly, we were under constant threat in Iraq. Our lives were at risk on a daily basis, car bombs, suicide vests and snipers. You get to know people much better and their true colours show in a war environment. Sam was a true patriot and a believer in democracy. He helped my country come from ruins and genuinely wanted to help my country become a better place. He helped all the locals and developed us to speak our mind and analyse the truth. Sam was nothing less than a hero to me and the team. Sam helped educate the locals on how to get their rights and how to the local politicians govern fairly. Sam risked his life every day to turn Iraq into a true democracy and he did it with pride. There were many organisations in Iraq at the time but Sam did more [than] what he was getting paid for and this is why I chose to continue to work with him and risk my life every day.

See Exhibit 1 (Letter from Dr. Ahmed Al-Nagr). As this Court is aware from the PSR and the letter submitted by Dr. Fiester, Mr. Patten continues to suffer from PTSD as a result of his experiences in Iraq and other conflict zones. See Exhibit 2 (Letter from Susan M. Fiester, MD) (Redacted).

---

[6] See Exhibit 1 (Letter from M. Marty Youssefiani) ("Sam has been an unwavering friend and colleague through his restless support, always on a bro-bono basis, for the promotion of liberal and democratic values for the Iranian people.").

Just as insightful into what motivates Mr. Patten's work, however, are the opportunities he has turned down, despite their substantial financial rewards. In the year before Mr. Patten's involvement in this investigation began, he turned down a lucrative offer to get involved with the elections in Montenegro. He declined the request because it would have required him to advocate on behalf of a prospective client who had taken anti-NATO policy positions, which he believed were contrary to U.S. interests. He also declined a job strategizing for European nationalist-populist parties despite the substantial financial security the job would have offered.

Not only would Mr. Patten pass on opportunities that conflicted with his democratic and pro-American principles, but he was also known to volunteer his services at no charge when he thought the circumstanced warranted it. For example, Mr. Patten watched closely the Alabama Special Senate Election to replace Jeff Sessions in 2017. Motivated by a desire to stop Roy Moore's election, Mr. Patten reached out directly to a write-in candidate, Colonel Lee Busby. Following their conversation, Mr. Patten packed his car and drove to Alabama to live with Col. Busby for several weeks and to serve as his spokesman, communications director, and strategist. He was not compensated for his work but the approximately 25,000 total write-in votes, of which Col. Busby received approximately 5,500, ended up being the difference in the election.[7]

In addition to describing Mr. Patten's professional motivations and commitment to American values, the letters sent on Mr. Patten's behalf also reveal an individual who is *genuinely* caring, kind and loyal to those he comes into contact with. Those traits have been on display from his early childhood through today. Mr. Patten's sister, Eliza, has written a heartfelt letter to this Court describing the impact her big brother had on her while growing up. She describes an

---

[7] Col. Busby has written to the Court to share his opinion that Mr. Patten is a good man "who has much potential for good and who has experienced a catharsis of self-examination as a result of this episode." *See* Exhibit 1.

environment where the kids were often on their own and how Mr. Patten's "creativity and curiosity added depth and excitement to my childhood, while his loyalty and kindness offered shelter." Exhibit 1 (Letter from Eliza Patten).  The family's former babysitter, Jennifer Wickenden, echoes much of Eliza's letter and speaks vividly about Mr. Patten's interactions with his siblings and others.  *See id*.

Whether it is treating everyone with respect, regardless of their lot in life or political views, to taking an interest in a friend or family member's cause, Mr. Patten is actively engaged in the lives of those he comes into contact with.  Corrine Graff writes that she knows Mr. Patten "to be a devoted and loving father and spouse, a good friend to our family, and a kind and gentle person…").  *See id*.  Robert and Elena Ames write about how Mr. Patten "cares a lot about his family and friends," and that he is "the kind of friend that's truly always available to share his time and lend a friend a helping hand."  *See id*.  Marty Youssefiani even writes of the impact Mr. Patten has had on his family and how his son "picked, among all our friends, Sam to seek advice when it was time for him to choose a career path and his college education."  *See id*.  He attributes much of his son's success to Mr. Patten's advice.  *Id*.

c.  *Acceptance of Responsibility*

In addition to providing the Court insight into who Mr. Patten is as a person, the letters submitted on his behalf demonstrate that Mr. Patten has truly and completely accepted responsibility for his conduct in this case.  Beginning with his sister, Eliza, Mr. Patten's friends and family have witnessed first-hand how Mr. Patten has come to terms not only with what he has done, but how he had been living his life:

> …these present circumstances, and the severity of the consequences he is facing, have led Sam to come to terms with his use of alcohol, to address his underlying depression, and to seek help from a place of true powerlessness and humility. I am proud to witness him reject

> temptations to view himself as a victim, instead claiming responsibility
> in a manner befitting someone of his integrity and decency.

*See id.*

Mr. Patten's wife, Laura, confirms that Mr. Patten has accepted full responsibility for his conduct and that he has used this experience to make positive changes in his life. *See id.* ("He has channeled his shame and anguish into getting healthy, volunteering, and 'digging deep' to figure out what led him astray."). His stepfather, Robert Perkins, writes about his own experiences as a lawyer and his opportunities to observe his own clients and others tell a Judge that "they had seen the error of their ways." *See id.* As he states, for some it was just talking the talk. He goes on to write that he can tell, "from the bottom of my heart, and with absolutely no equivocation, that Sam has used the excruciating process that has confronted him for the last year to assess the direction of his life and 'who he really is.'" *Id.*

Long-time family friend, Robert Morgan, wrote to the Court to offer his perspective on Mr. Patten's character. In particular, he writes that "[t]here is a consistent strain of idealism in Sam that includes setting high standards and holding himself to account when he fails to meet them. Over a long trajectory of time Sam has taken personal responsibility for his career, his family and his choices, good and bad." *See id.* John McGovern tells the Court how Mr. Patten wrote his friends and relatives to admit his wrongdoing and to apologize for what he had done. *See id.* He also provides that this has been a particularly painful experience because Mr. Patten "cares so deeply about values of honor and character." *Id.*

This should be a significant consideration for this Court in fashioning Mr. Patten's sentence. Both from the media and from many of the defendants who have found themselves prosecuted as a result of the Special Counsel's investigation, there has been a sometimes subtle (and sometimes not so subtle) effort to delegitimize the investigation in order to shift blame to

politics and away from an individual's own actions.   Many of the accused connected to this investigation have taken to the media to complain about the fairness of their prosecution, to raise doubts about their guilt even after pleading guilty, and to capitalize on the public sentiment of their supporters.   But through it all, even in the face of media reporting that has falsely labeled Mr. Patten a lobbyist, or a Manafort "associate," or a Trump-supporter, as well as the personal attacks and death threats he has received, Mr. Patten has quietly and without fanfare or attention, worked to improve himself and to make sure he understands what led him to act in a manner inconsistent with his own principles and character.   *See* Exhibit 3 (Letter from W. Samuel Patten).   He has sought mental health treatment, he has given up alcohol, and he has spent this time of great uncertainty, which brings its own anxiety, bettering himself and his community.   He has attended more than 150 AA[8] meetings since his August 31 guilty plea and has volunteered with three different organizations including well over 60 hours spent tutoring local students through a nonprofit organization.[9]

To complete the cliché, Mr. Patten has done more than talk.   He has walked the walk.   And not because he is trying to better position himself for leniency from the Court.   He has done so because it is who he is and because he knows that he alone is responsible for what has happened. As his longtime neighbor, writes, "When I asked him what lesson [his son] should take from this, Sam replied, 'When you mess up, own up.'   This is one of the valuable messages he also brings

---

[8] *See* Exhibit 1(Letter from Mervin Wampold, Jr.) (attesting to Mr. Patten's commitment and dedication to the AA program and sharing his sincere belief that Mr. Patten "has not only owned the mistakes he made, but more importantly is ready to be the best person he can be").

[9] *See* Exhibit 1 (Letter from For Love of Children ("FLOC")) (providing that Mr. Patten "is dedicated and shows great concern for his student and always willing to step in to be a substitute for other students when needed.   It has been an incredible pleasure working with Sam these past few months and I look forward to finishing out the year with him").   In addition to his work with FLOC, Mr. Patten has volunteered with Sasha Bruce Youthworks and Beacon House.

with him in his local volunteer work with at-risk youths because he firmly believes that moral compasses, including his own, can and must be recalibrated when they go off track." *See* Exhibit 1 (Letter from Lauren Solnik).  Due to Mr. Patten's sincere and remarkable rehabilitation over the past several months, especially during a time of great stress and uncertainty, we respectfully submit that a non-incarceration sentence would best serve the purposes of federal sentencing in this case.

### 3.    The Kinds of Sentence Available

This Court has tremendous authority and discretion over what kind of sentence to impose on Mr. Patten.  As stated in the PSR, this Court has the ability to impose a sentence of probation should it find such a sentence appropriate under the § 3553(a) factors.  Given the reasons provided in this pleading, as well as those to be addressed through the government's U.S.S.G. § 5K1.1 motion, we respectfully request that the Court sentence Mr. Patten to a term of probation.

### 4.    The Need to Avoid Unwarranted Disparity Among Similar Offenders

Historically, there have been very few prosecutions under FARA.  Indeed, a 2016 DOJ report counted seven total prosecutions under FARA since 1966.[10]  According to the report, only one of those charged was convicted at trial, two pled guilty, two were convicted on non-FARA charges and two had their cases dismissed.  For that reason, it is difficult to measure the potential disparity between similar offenders particularly because, historically, offenders have not been prosecuted at all.[11]  Instead, up until recently, most individuals or entities found to have violated FARA were only required to come into compliance.  Therefore, the mere prosecution of a FARA charge *alone* results in substantial disparity among similar offenders.

---

[10] *See* Office of the Inspector General, Department of Justice, Audit of the National Security Division's Enforcement and Administration of the Foreign Agents Registration Act, *available at* https://oig.justice.gov/reports/2016/a1624.pdf (last visited March 25, 2019).

[11] A fact that likely explains why the Sentencing Commission has to date not promulgated a Guideline for FARA violations.

The few cases that might provide some guidance for a disparity analysis are so different from Mr. Patten's case that they are of limited value. To begin with, all of the potentially relevant recent FARA prosecutions have involved extensive efforts to conceal foreign government involvement in proactive and well-coordinated campaigns to change U.S. policy. They have also typically involved efforts to lobby on behalf of Specially Designated Nationals[12] ("SDNs") or other prohibited/sanctioned entities or countries.

For example, in *United States v. Ben Israel*, Case No. 1:13-cr-00572 (N.D. Ill.), the defendant was originally charged with acting as a foreign agent without notice to the Attorney General (18 U.S.C. §951(a)), failing to register under FARA, and violating the International Emergency Economic Powers Act (50 U.S.C. §1705(c)). In summary, the case involved unregistered work on behalf of several SDNs that had been sanctioned based on their history of human rights abuses, election fraud, and voter intimidation. The defendant's conduct included extensive efforts to lobby U.S. officials to remove the foreign principals from the SDN list. For that reason, the government and the defendant agreed, as part of the plea agreement, that U.S.S.G. § 2M5.1 applied to the offense conduct, which resulted in an advisory guideline range of 10-16 months. The defendant did not receive any credit for cooperation and the Court ultimately imposed a below-Guideline sentence of seven months.

In *United States v. Mark Deli Siljander*, Case No. 4:07-cr-00087 (W.D. Mo.), the defendant, a former member of the United States House of Representatives, was charged along with several other individuals and an Islamic charitable organization with numerous offenses

---

[12] *See* https://www.treasury.gov/resource-center/sanctions/sdn-list/pages/default.aspx (defining SDNs as individuals or companies that are controlled by or are acting on behalf of targeted countries or because of non-country specific designations such as a connection to terrorism or drug trafficking).

including FARA violations, money laundering and obstruction of justice.  In summary, the charity in question hired Siljander and others to lobby on its behalf in an effort to have the charity removed from a list of debarred entities and from the Senate Finance Committee's list of charities suspected of funding terrorism.  Siljander was interviewed by the FBI and falsely denied having performed any advocacy on behalf of the charity and denied having received any payments for any alleged work.  After he was indicted, he again met with the FBI, this time in the presence of his own lawyers and the prosecutors, and again lied about his involvement in the offense conduct.

Siljander eventually pled guilty to two counts on the eve of trial.  The Sentencing Guidelines recommended a sentence of 10-16 months on an obstruction of justice count and the government agreed that there was no analogous Guideline for the FARA count.  Based on the extensive nature of Siljander's conduct on behalf of a debarred organization with terrorist ties and his repeated lies, the government requested a total sentence of 36-48 months.  The court sentenced Siljander to a period of incarceration of 12 months and one day.

Another defendant in the Siljander case, Abdel Azim El-Siddiq, also pled guilty to a FARA offense on the eve of trial.  El-Siddiq was a U.S. citizen who worked as a fundraiser for the debarred charity.  El-Siddiq was also the individual who hired both Siljander and another former Congressman to lobby on the charity's behalf.   He was instrumental in structuring the financial payments in a way that would conceal the charity as the source of funds.  Despite the government's request for a sentence of incarceration, the Court sentenced El-Siddiq to serve a two-year term of probation.

As stated at the outset, Mr. Patten's FARA conduct is far different from that found in other FARA prosecutions.  Unlike the Manafort case and those cited above, Mr. Patten was not hired to lobby in the United States.  While that does not mean he cannot now be found to have violated

FARA, it does show a substantial difference between his state of mind and that of the other defendants.  Manafort, Siljander, etc., were specifically hired to lobby U.S. politicians.  With that knowledge and intent, they then created layers of transactions and entities in order to hide from the individuals they were lobbying, the foreign country or actor who was footing the bill and who was behind the campaign to influence.  Mr. Patten, on the other hand, had no intention or desire to lobby U.S. officials on behalf of his Ukrainian clients.  Nevertheless, he did over time cross the line on more than one occasion and for that he must be punished, but we submit that the punishment should take into account the vastly different nature of his offense as compared to other FARA prosecutions.

To the extent the Court intends to consider other cases brought by the Special Counsel's office when evaluating potential disparity between sentences, we submit that the requested probationary sentence for Mr. Patten falls in line with the sentences imposed on Alex van der Zwaan, George Papadopoulos and the government's recommended sentence for Lt. Gen. Michael Flynn.

As the Court no doubt recalls, van der Zwaan was an attorney who, while represented by counsel, lied to the Special Counsel on multiple occasions during a voluntary interview.  Even when confronted with some of those lies, he persisted in them.  He also withheld documents responsive to the SCO's investigation. van der Zwaan did not receive any credit for cooperation and this Court sentenced van der Zwaan to 30 days of incarceration following his guilty plea to making false statements under 18 U.S.C. § 1001.

George Papadopoulos also pled guilty to violating 18 U.S.C. § 1001 after having lied repeatedly to the SCO regarding his interactions with Russians and the timeframe when those contacts occurred.  Papadopoulos worked for the Trump campaign and directly impeded the FBI's

investigation into the existence of links between Russian operatives and the campaign, as well as alleged efforts to interfere with the 2016 Presidential election.  Papadopoulos did not receive any credit for his cooperation and the Honorable Randolph D. Moss sentenced him to serve 14 days of incarceration.

Finally, Lt. Gen. Michael Flynn served in a number of roles for the campaign and transition team and briefly served as the National Security Advisor to President Trump.   His interactions with Russian officials during the election, transition and administration went to the very heart of what the FBI was investigating at the time of his interview.  Not only was Flynn found to have lied about his contacts with Russian officials but he was also found to have made materially false statements or omissions in connection with his FARA filings for work done on behalf of the Republic of Turkey.  *See United States v. Michael T. Flynn*, Case No. 1:17-cr-00232-EGS (Dkt. #46).  He pled guilty to making false statements and his offense conduct included the facts surrounding his FARA violation.  His advisory Guideline range is 0-6 months and based on his substantial assistance, the SCO filed a § 5K1.1 motion on his behalf providing that "a sentence that does not impose a term of incarceration – is appropriate and warranted." *Id.*at 1.   Flynn is still awaiting sentencing.

In all, we respectfully submit, especially in light of the government's anticipated § 5K1.1 motion, that a sentence of probation will ensure that there is no unwarranted disparity between Mr. Patten's sentence and that imposed on other defendants guilty of similar conduct.

### 5.      Purpose of Federal Sentencing

As noted earlier, Congress has identified four purposes of federal sentencing that must guide district courts in selecting a sentence.  The sentence must be "sufficient, but not greater than

necessary" to serve those purposes.   We respectfully submit that all the purposes of federal sentencing would be fully served in this case by a probationary sentence.

The first purpose of federal sentencing is "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."   From this day forward, Mr. Patten will stand convicted of a federal felony offense.   His prosecution reflects the seriousness of his offense and a sentence of probation will promote respect for the law, especially considering the specific facts of this case.   For the reasons outlined throughout this pleading and because of Mr. Patten's extensive cooperation, a sentence of probation is a just punishment for his offenses.

The second purpose of federal sentencing is "to afford adequate deterrence to criminal conduct."   We respectfully submit that this goal would be fully served by a sentence of probation. A strong message of deterrence has already been sent as a result of Mr. Patten's prosecution, as well as that of other individuals recently charged with FARA violations.   According to one source, FARA supplemental filings "more than doubled from 618 to 1,244 last year…."[13]   Even beyond the new focus on using criminal prosecutions to enforce FARA violations, a sentence of probation, coupled with community service and other restrictions on Mr. Patten's liberty, is sufficient to send a strong message of deterrence to the public especially under the unique circumstances presented here where, unlike other FARA prosecutions, Mr. Patten did not conceal from those he interacted with the foreign person or entity he was acting on behalf of.   As the Supreme Court recognized in *Gall v. United States*, 522 U.S. 38, 48-49 (2007), although custodial sentences are more severe than probationary sentences:

---

[13]   *See*   https://www.nbcnews.com/news/us-news/mueller-effect-fara-filings-soar-shadow-manafort-flynn-probes-n838571 (last visited March 22, 2019).

[o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See *United States v. Knights,* 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " (quoting *Griffin v. Wisconsin,* 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987))). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court. Gall, for instance, may not patronize any establishment that derives more than 50% of its revenue from the sale of alcohol, and must submit to random drug tests as directed by his probation officer.

The third purpose of federal sentencing is "to protect the public from further crimes of the defendant."  Mr. Patten, at age 47, is being sentenced for a crime for the first time in his life.  He has had no prior contact with the criminal justice system.  To the extent his decision-making over the past few years was influenced by mental health or substance abuse issues, those are, for the first time, being fully addressed through ongoing treatment and programing.  Mr. Patten has a lifelong history of obeying the law and contributing to his family and society.  The fact that he has used this situation to understand his behavior and reflect on how and why he got here, strongly suggests that he presents no danger of recidivism.

The fourth purpose of federal sentencing is "to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner."  This factor militates in favor of a probationary sentence so that Mr. Patten can continue with the treatment and programs he has voluntarily attended since his guilty plea.  We respectfully submit that Mr. Patten's rehabilitation over the past seven months as well as his performance on pre-sentence release

demonstrates that he is worthy of a non-custodial sentence so that he can continue uninterrupted with his treatment and recovery.

## IV.      CONCLUSION

As evidenced by his letter to the Court, Mr. Patten is sincerely remorseful for his offenses. *See* Exhibit 3.  Since his guilty plea on August 31, 2018, Mr. Patten has put in the time and effort to understand his conduct and to address all of the issues that may have led to his behavior.  He has not only accepted responsibility through his guilty plea and extensive cooperation, but he has reexamined his life and committed himself to the principles and morals that guided him prior to the events of the instant case.  For these reasons and any others that may appear to the Court or that may develop at the sentencing hearing, we respectfully request that the Court impose a sentence of probation to include community service and continued substance abuse and mental health treatment.

Dated:    April 8, 2019                                      Respectfully submitted,

                                                             W. SAMUEL PATTEN
                                                             By Counsel


                                                             /s/ Stuart A. Sears
                                                             Stuart A. Sears
                                                                   *Counsel for W. Samuel Patten*
                                                             SCHERTLER & ONORATO, LLP
                                                             901 New York Ave., NW
                                                             Suite 500 West
                                                             Washington, D.C. 20001
                                                             Ph: 202-628-4199
                                                             Fax: 202-628-4177
                                                             ssears@schertlerlaw.com

THE OLD RECTORY
ENGLEFIELD

20ᵗʰ October 2018

Dear Judge Jackson,

I am Sam's Godfather. He worked for me as an assistant in the House of Commons when I was a Member of Parliament. For many years when I was on the Board of Overseers at Harvard University and Executive Editor of The Economist, I would also see him. So our's was a friendship that developed in his adulthood, despite the separation of an ocean, of our ages and, perhaps, of our politics.

I admire this capacity for friendship that

he has. He has never asked for favours or been disingenuous towards me. He is fun and straightforward and undogmatic. Even though I am now in my 70's, Sam makes the effort to see me when he comes through London.

I have known him to be a dolt on occasion (never more than the one that occasions this letter.) But after some 40 meals together over 25 years, he has never been anything but kind and compassionate, without – for all his adventurous life – being callow or cavalier.

Sam is an international guy, at ease in the Congo or Russia, London or Kiev. That is rare these days when most Americans of his age and background are safely ensconced behind domestic bond-trading desks.

THE OLD RECTORY
ENGLEFIELD

He deserves credit for that. How many
Americans these days (unlike the past)
are prepared to go out to central Africa
to engage in the bustle and dangers of
uncertain democracies? How many are
capable of the modesty of manners, the
susceptibility to foreign mores to make
this leap? Educated and open-hearted,
he is an appealing American abroad.
A dolt not to have registered but not a
criminal in intent nor a man requiring
further punishment.

Do a Godfather's duties include prison

visiting? That is a question I hope not to need to answer, not for my sake but for his.

   With my thanks to you for reading this letter and my handwriting.

   And all respects.

Dudley Fishburn
DUDLEY FISHBURN

**Aizhan Kulakhmetova Patten**

October 24, 2018

The Honorable Amy Berman Jackson
United States District Judge
For the District of Columbia
E. Barrett Prettyman United State Courthouse
333 Constitution Avenue, NW
Washington, D.C. 20001

Your Honor,

I am writing this to respectfully request your Honor's leniency on behalf of my ex-husband Sam Patten. My name is Aizhan Kulakhmetova Patten, I have been a member of the Virginia State Bar (79701) in good standing since 2010. I no longer practice law, but maintain an associate status and instead own and run a Pilates studio in Alexandria, VA. Sam and I were married for seven years (1999-2006). After the divorce, we remained on good terms and together raised a son, Max, who is now a freshman at ███████████.

I have two reasons for writing this letter. One, I feel I owe it to Sam because he is one of the most decent, selfless and humble human beings I have ever encountered. Secondly I believe that as an ex-spouse and someone who has known Sam for over two decades, I can help in painting an accurate and objective picture of him.

I first met Sam in Kazakhstan in 1996. He came there soon after graduating college. I wondered when I met him why would a young man who could have a stable and safe life in America would chose to go half-way across the world to a country that a few could even point to on a map. Adventure perhaps? There was a bit of that, but I believe it was Sam's sense of duty to work hard and to make a difference in places where a change could be made.

Kazakhstan, Russia, Georgia, Iraq - these were all places where Sam chose to work not because he sought adventure but because he believed he could make a difference. The desire to make a change may have started in youthful romanticism but living and seeing these places change before his own eyes, it was impossible not to believe in the possibility of positive change. Life in these countries is far from ideal but comparing to what it used to be, things certainly have improved. Changes come from within, but they also are ushered in by outsiders like Sam.

Most of the overseas assignments Sam took were far from lucrative. Many of his work trips were also quite dangerous. Now, as an independent observer and not his wife, I find Sam's readiness to sacrifice his personal comfort and safety for a far-flung work cause admirable. Candidates he supported were often blacklisted by the local despots. Boris Nemtsov, one of the

last remaining liberal Russian politicians with whom Sam worked closely, was murdered, most likely on Putin's orders, in 2015. Sam was shaken and heart-broken when he learned about his assassination.

Another of Sam's commendable traits is his humility and his consistency in treating everyone, regardless of their station in life, with an equal amount of respect and attention. It's what really sat him apart from his fellow American expatriates in Kazakhstan and in Russia. When so many of them treated locals as second-class citizens, Sam treated everyone equally well.  Back home in the States, Sam behaved no differently. From his posh Georgetown classmates to Maine friends who had to join the Navy or the Army to escape their small towns, Sam was interested in and solicitous of all of them equally.

I also believe Sam is a true patriot. I noticed his love and affection for his country and for his home state of Maine early on in our relationship. As a long-term expatriate, Sam was eligible for certain state and local tax exemptions. When his tax preparer offered him the opportunity to file as a non-resident and pay less in tax, Sam declined the savings. He didn't want to give up his Maine resident status because for him it meant he couldn't continue calling it home and he loved Maine too much for that. That episode really struck me. He wasn't a loud, in-your-face proud American but proved his patriotism in quiet but more meaningful ways, like coaching a Little League team in Kazakhstan. Many of the local kids never played baseball, and while they were far from being pros by the end of the season, they learned a few things about America and about Maine; they likely still remember a kind and gentle American young man. I'm convinced that those kids who are now young adults will less likely be swayed by now rampant anti-American propaganda.

Fast-forward to today's proceedings, I know that Sam is utterly devastated morally, financially and professionally. He is profoundly ashamed and, I believe, has already paid dearly for his mistake. In fact, it wouldn't be an exaggeration to say that he lost practically everything he worked his entire adult life.  His business has been ruined, he has been socially ostracized, labeled a felon for the rest of his life, is now unemployed with dim prospects of regaining employment in the near future. Despite that, I think what's eating at him the most right now is the pain and disappointment he thinks he caused to those around him. This kind of selfless concern about others is classic Sam.  Aside from his wife Laura, who is wonderful and supportive, I don't think anyone knows the depths of misery he must be going through. He is bravely absorbing the responsibility for his mistake, and I think, he will always be haunted by it. It seems that inflicting more punishment on him would serve little purpose other than completely destroying the man.

Finally, I want to mention Max, Sam's son. Max is very close to his dad and is extremely concerned for him. This is an excerpt of what Max wrote on his Facebook page on the day when the news of Sam's plea agreement were made public:

> *...My dad is a person who believes in this country and its values. He's worked for NGOs and politicians that are similarly freedom-oriented. He made a mistake and admitted to it. There are far less scrupulous people involved in this...*

*I'll follow my dad's example of dignity and civility in the face of something messy and ugly. We should all strive to do the same.*

I believe that if anyone earned a second chance through his prior personal and public conduct, it is Sam. I humbly restate my plea for your Honor's leniency in this case. If there is any other information I can provide, please do not hesitate to contact me.

Respectfully,

Aizhan K. Patten

Laura Patten

The Honorable Amy Berman Jackson
United States District Judge for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue NW Washington DC 20001

March 12, 2019

Dear Judge Jackson,

My name is Laura Patten and I write in support of William Samuel Patten, Jr., who awaits sentencing in your court for his failure to register under the Foreign Agent Registration Act (FARA).  I write as a wife, an American, and a United States national security expert.

I have devoted the bulk of my adult life to promoting U.S. interests and protecting our nation from foreign adversaries, first as a Central Intelligence Agency covert operations officer overseas, and later as an overt Counterintelligence Division Director at the Department of Energy here in Washington.  In my last government position, I served as a Senior Counterintelligence Officer detailed to the Federal Bureau of Investigation's Criminal Investigation Division, Transnational Organized Crime (East), which covers Ukraine and broad swaths of the former Soviet empire.  In 2017, I joined a private firm where I still work.  I hold a Master's in International Affairs from Columbia University, and am pursuing a Ph.D.

Sam admits to, and takes full responsibility for, the conduct that resulted in the government's decision to charge him.  He has channeled his shame and anguish into getting healthy, volunteering, and 'digging deep' to figure out what led him astray.  I am confident that going forward Sam will comport himself in the honorable manner that is consistent with his previously unblemished legal record and stellar reputation.  Sam's honesty about failing to register, and his unwavering willingness to cooperate with the government, speaks to his good character and respect for the rule-of-law.

I cried while watching Sam record a public service video in which he admits his violation and encourages others to comply with FARA.  While I felt proud of Sam's candor and proactive effort to make amends, I also felt deep anguish.  Sam has never, and would never, hurt the United States.  To the contrary, Sam is patriot who has served our nation with distinction.  Even now, while battered and bruised, fundamentally Sam remains the same person I married: A committed agent of pluralistic American democracy.

1

Described as a 'lobbyist' in the media, most of Sam's professional activities have involved providing strategic campaign and communications advice to political candidates, business leaders, and human rights advocates. He is a vocal opponent to Vladimir Putin and other authoritarians. Over the years, Sam developed an expertise supporting clients struggling against corrupt regimes in challenging foreign environments. Sam so passionately believes in giving voice to the voiceless, that I lost track of how many times he accepted pro-bono clients.

As a spouse, Sam is kind and forthright. He has steadfastly supported me through losing our baby in utero, three failed adoptions, ████████████████ Despite our family-building challenges, Sam and I had held out hope of adopting a child together. However, his felony conviction precludes this possibility and robs me of the remaining hope of motherhood. That alone is a devastating life sentence that no amount of 'rehabilitation' can overcome.

The impact on our immediate and extended family has been gut-wrenching. Since pleading guilty, Sam has received death threats, been slurred inaccurately as a liar, and lost his economic livelihood. We have both been taunted on social media, and wrongly assumed to be aligned with a cast of characters who threaten our democratic processes, institutions, and values.

The legal process has destroyed our financial security and bankrupted Sam, causing him to cash-in his retirement savings, which were earned over decades, including in war-zones. It will take years, and likely decades, for our family to recover the financial loss and opportunity costs. Soon after accompanying Sam to your courtroom, for example, a moderator disinvited me from speaking about financial crime to an industry gathering because "the FBI is uncomfortable with you speaking about this topic given who your husband is." The government then supplied a Special Agent from the Chicago Field Office to replace me at the CPE event. Also, after Sam's plea, we were subjected to two IRS audits, the first of our lives, and an investigative tactic frequently used by federal law enforcement – which resulted in the finding of no criminality.

Before he was charged, I witnessed Sam share with Administration officials, Congressional Members and staff, academics, journalists, and military officers, his insights and observations from working overseas. Sam was forthcoming about his work with anyone who asked. Respected thought-leaders frequented our home and solicited Sam's analysis of complex events related to the former Soviet Union, including his work in Ukraine – a small aspect of which he failed to register and caused him to be charged. In that vein, as far back as 2014, I wrote and spoke to my FBI supervisors, as well as to Special Agents assigned to Washington Field Office counterintelligence squads, about Sam's ability and willingness to help them access and analyze foreign subjects of investigative value – including those that are pertinent to this case. This illustrates that, while Sam's failure to formally register is his responsibility, and his responsibility alone, the omission was *not* intended to hide his foreign associations from the US government.

2

Recently, the government announced it believes that Ukrainian-Russian citizen, Foreigner A, was in the throes of a Russian intelligence agency during the period in which he worked with Sam. This news, if correct, is devastating to me and Sam. Generations of our family have stood against Russian aggression, both professionally and personally. One does not have to look as far back as Sam's paternal step-grandfather's well-documented resistance to Russian blackmail. One could look at my government career, in which I spent years, and received awards for, actively countering Russian intelligence agencies both here and abroad. Or one could look at the reports that I made to proper federal authorities after Sam and I appeared to have been poisoned during a 2016 FBI-authorized trip to Russia – reports that I filed through official government channels and for which there was zero follow-up from authorities.

As a counterintelligence officer, I was aware of, and engaged in, multiple efforts to warn American citizens when a specific foreign threat actor targeted him or her. Thus, I am left wondering what would have happened had our government warned us, per normal and customary national security protocols, about what it believes is Foreigner A's affiliation with Russian intelligence? Certainly, had we known what the government believed, in light of my profession Sam would have ceased his association with Foreigner A and not partnered with him for business in the United States, where FARA applies, or anywhere else in the world. We also may have been able to help the government, in some small way, thwart Russian interference.

As outlined above, Sam admits, owns, and apologizes for his failure to register. I love Sam profoundly, yet if he were not sincerely penitent, I would not write this letter.

In my opinion, Sam should not have to go to prison for being an unwitting pawn in a national tragedy that even our government, with all its resources, did not stop – and which in all likelihood it covertly observed for some time.

Sam will accept with dignity any punishment the court imposes on him. If sentenced to prison, it will be difficult, but we will remain an intact family; Sam is resilient, his son from a previous marriage is a young adult now, and I am self-supporting. Ultimately, in the words of the late W.E.B. Dubois, Sam will "live and progress to a greater, broader, and fuller life." However, Sam faces a long, hard, journey to rebuild himself, his livelihood, and any notion of a fuller life. Prison would only retard this arduous process and do nothing to help society. Therefore, I hope this letter helps persuade the court to apply an alternative punishment.

Thank you, Your Honor, for considering my input as you weigh pertinent facts and circumstances to decide Sam's sentence. I appreciate your deliberation.

Respectfully,

Laura Patten

Laura Patten

3

**The Honorable Amy Berman Jackson**          **Dr Ahmed Al-Nagar**
**United States District Judge**
**For the District of Columbia**
**E. Barrett Prettyman United States Courthouse**
**333 Constitution Avenue, NW**
**Washington DC 20001**

Date: 13/10/18

Your Honor,

The purpose of this letter is to provide recommendation for W. Samuel Patten (Sam) in the hope to give you a different view on him.

I am a dual citizen, British and Iraqi. I am also a registered Pharmacist in the UK and hold a PhD. I met Sam in the Green Zone in Baghdad, Iraq April 2004. At that time Sam was working at the International Republican Institute and he was presenting his work in Iraq and he was helping my country. I was fascinated by his presentation and his ethos. After that presentation, I approached Sam for his card and later was offered to work within his team. Sam managed me directly for 6 months and continued to be in touch with him via emails and social media.

In my short time working with Sam directly, we were under constant threat in Iraq. Our lives were at risk on a daily basis, car bombs, suicide vests and snipers. You get to know people much better and their true colours show in a war environment. Sam was a true patriot and a believer in democracy. He helped my country come from ruins and genuinely wanted to help my country become a better place. He helped all the locals and developed us to speak our mind and analyse the truth.  Sam was nothing less than a hero to me and the team. Sam helped educate the locals on how to get their rights and how to the local politicians govern fairly. Sam risked his life every day to turn Iraq into a true democracy and he did it with pride. There were many organisations in Iraq at the time but Sam did more what he was getting paid for and this is why I chose to continue to work with him and risk my life every day.

After I left Iraq, we kept in touch and Sam helped me get my first job in London, he wrote my reference for my first job. He continued to support me even though I was not working with him and he continued to mentor me. Sam is a true hero and it has been an honour to know him and work with him. Thanks to him and many others, I am who I am today.

Kind Regards,

Dr Ahmed Al-Nagar *MPharm MRPharmS IPRESC PhD*



Caspian Balestra Group

December 01, 2018

The Honorable Amy Berman Jackson
United States District Judge
For the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, NW
Washington DC,  20001

### RE:  Mr. W. Samuel Patten

The Honorable Amy Berman Jackson,

My name is M. Marty Youssefiani, President and CEO, Caspian Balestra Group, Inc. an international business communications firm, focusing on renewable energy, based in Potomac, MD.

An American of Iranian ethnicity, I have known Mr. Sam Patten for the better part of 15 years, a relationship which first began as professional colleagues, but which eventually extended to include our families.

Sam has been an unwavering friend and colleague through his restless support, always on a *bro-bono* basis, for the promotion of liberal and democratic values for the Iranian people.  Sam was there when the prospects of such principals in Iran were a budding dream -- out of grasp for the 80 million people in Iran.  Today, however, the world watches in awe the courage Iranian woman, men, young and old demonstrate through their daily expressions and selfless demands for such liberty.

To those of us who've been dreaming for the day when Iranians too might find themselves free to pursue their inalienable rights to life, liberty and pursuit of happiness, that day might be approaching.  And when it finally does arrive, we shall know that if it wasn't for the untiring support of friends like Sam Patten, freedom might have arrived even later for 80 million people.

Page Two,
The Honorable Amy Berman Jackson
December 01, 2018

On a personal level, Sam and his wife Laura are family to my wife, Roya, and son, Darius-Raymond.   An observant and particularly intuitive young man that Darius is, he picked, among all our friends, Sam to seek advice when it was time for him to choose a career path and his college education.  It was largely because of Sam's advice that Darius is today a thriving junior at Villanova University, pursuing his own dreams.

When news reports of Sam's current predicament broke, Darius was particularly impacted, calling his mother and me immediately to tell us:  "no matter the facts, I know in my heart, uncle Sam is a good, decent and honorable man, and I hope he will be known for who he really is.  I will be praying for him!"

In recent months, we have seen a different side of Sam:  contemplative and of course nervous and very worried.  Financially exhausted and emotionally drained, he is most worried about others:  his wife, his son, parents and those he feels he has let down through what he admits as his personal lapse in judgment.   He has made real changes to his life, and has done his best to contritely prepare to face the consequences of his actions.

Having full faith in our judiciary system, our family is fully confident in the spirit of fairness that the law treats each and every citizen.  We also have faith in knowing that Man will be judged by the totality of the life he has lived.   In that respect, as Darius said:  "[We] know in [our] heart Uncle Sam is a good, decent and honorable man."  And so, it is our hope that he will be afforded the maximum lenience allowed for under the statutes, giving him a chance to rebuild a life that has forever been changed.

Sincerely,

M. Marty Youssefiani
President & CEO

# Colonel Lee Busby

## US Marines (retired)

November 26, 2018

The Honorable Amy Berman Jackson
United States District Judge
For the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, NW
Washington, DC  20001

Your Honor,

I am writing you in connection with the upcoming sentencing of Sam Patten, related to a "failure to register as a foreign agent" violation.

I'm a retired Marine Colonel and recently ran as a write-in candidate in a high-profile US Senate race. I came to know Sam when he showed up as a campaign volunteer for me in the Alabama Special Senate Election of 2017. He worked mostly in helping to write OpEds and in coordinating media requests for interviews. He is a brilliant writer, a walking encyclopedia of political knowledge, and a selfless worker. On the personal side, I found him thoughtful and devoted to his family.

Sam wrote me recently to say that he was being prosecuted in relation to a failure to register as a foreign agent. He led by saying that he was ashamed of the position that he'd put his family and supporters in, and that he'd been negligent in meeting the legal requirements applicable to some of the work that he'd been doing. He related that he planned to plead guilty to the charges and not try to stretch out the ordeal or cloud the issue; he wanted to accept whatever punishment was commensurate with his violations.

I know nothing of the specifics of the charges or the penalties that go along with those violations. I do know that Sam Patten is a good man. A good man who has erred, and now seeks to do the right thing to make up for his mistakes. I think that Sam is a man who has much potential for good and who has experienced a catharsis of self examination as a result of this episode.

I'm sure that I cannot begin to imagine the multitude of personalities and predicaments that you must encounter in the course of your service as a Judge. I trust that in examining this case, you'll be able to see the glimmer of character in Sam, that I refer to above. And that you'll examine the totality of the man, in forming a perspective of his transgressions.

Sincerely,

*Gerald Lee Busby.*

October 15, 2018

The Honorable Amy Berman Jackson
United States District Judge
For the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Dear Honorable Amy Berman Jackson:

My name is Eliza Patten, and I am the older of Sam's two younger sisters. I am a lawyer who has dedicated my career to serving families involved with the child welfare system. Growing up in our family, Sam and I experienced our own set of parental inadequacies and responded by looking out for one another from a place of deep love and interdependence. Sam's creativity and curiosity added depth and excitement to my childhood, while his loyalty and kindness offered shelter. I captured some of this in a poem I wrote about Sam when I was a Stanford undergraduate:

In the children's playroom,
    on the second floor,
      my brother built a Fisher-Price kingdom and claimed himself king.
He fantasized a constitution,
    as the late-afternoon sun
      fell slowly into the river that ran behind our house.
Shall I come in? May I? I asked
    and was invited in,
      an ordinary subject of my brother the king.
Drama and one boy's brilliance was our escape.
In my regulation Fisher-Price family home,
    under a jagged shadow
      cast by my brother's castle made of blocks and the setting sun,
three kids and a one-car garage,
    and I was happy.

Beyond Sam's character assets of kindness and loyalty that I benefitted from as his younger sister, I have always stood in awe of Sam's fierce idealism, belief in the fundamental tenets of our Western Democracy, and commitment to engage with our political history from a young age. The earliest memory I have of Sam's political leanings is the 1984 Presidential election. I was 10 and Sam just 13. We attended a small, rural school in Maine. I can still remember the debates Sam would organize with our classmates in the hallways that fall, and the fervor with which he set about creating campaign posters for Walter Mondale.

Whether organizing a campaign event in Maine for Senator Collins or then Presidential candidate George W. Bush, supporting open elections in Kyrgystan for Freedom House, or in Bangkok for The Foundation for Asian Democracy and Freedom, or registering women voters in the run up to Iraq's first free election, it has always been ground level contact with the individuals whose vote drives the democratic process that energizes and inspires Sam. It allows him to use his creativity, passion, and idealism to further one of his core values—civic engagement.

With no ready role models to draw upon for how to raise a son, Sam relied from the beginning on his character assets of kindness, curiosity, and loyalty to forge a parenting path when his son Max was born. When I visited Sam in Almaty in the fall of 1998, he was busily focused on "nesting"- relocating to an apartment with more brightly lit elevators, shopping for cheerful furniture, preparing for the imminent arrival of his wife Aizhan and infant son Max. Today, Sam is blessed with a close and loving relationship with his intelligent and thoughtful son. A college freshman, Max is actively contributing his voice to current debates on ████ campus as a writer for the student newspaper, following in his father's footsteps by engaging in active, participatory discourse on subjects such as sensible gun control legislation and the importance of high voter turnout.

It is of course a truth that the character strengths of idealism and loyalty also carry the challenge that they can make you blind to what is in front of you. Likewise, growing up as we did, with self-absorbed parents and a need to figure things out for ourselves, can make it more difficult to recognize when it is time to ask for help. It is clear that some measure of clouded judgment and poor decision-making was at play in leading to Sam's present circumstances.

The impact this case has had on Sam cannot be understated. It has undermined others' faith in Sam's expertise—expertise he spent his life accumulating—rendering uncertain his chances of future employment. And more searing to me, it has undermined his faith in himself, leading Sam to question what he has made of his life and how he will find his way moving forward.

On the flip side, these present circumstances, and the severity of the consequences he is facing, have led Sam to come to terms with his use of alcohol, to address his underlying depression, and to seek help from a place of true powerlessness and humility. I am proud to witness him reject temptations to view himself as a victim, instead claiming responsibility in a manner befitting someone of his integrity and decency. I pray from the very bottom of my heart that this Court exercise its discretion to recognize the contributions Sam has made as a public servant, a father, a husband, a brother, and a son, and to be lenient in sentencing. From the eyes of this little sister looking up to her big brother, there is no one more deserving of an act of grace in this moment.

Respectfully submitted,

*Eliza Patten*

Eliza Patten

November 6, 2018

The Honorable Amy Berman Jackson
United States District Judge
For the District of Columbia
E. Barrett Prettyman United Sates Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Your Honor,

My name is Jennifer Wickenden.  I was born and raised in Camden, Maine.  I graduated Mount Holyoke College in 1988, worked as a Paralegal for five years at Simpson Thacher & Bartlett in NY and London, studied for a semester at Columbia Teachers College, from which I took a semester's leave of absence in order to accompany my husband on a six month assignment in London, returning together 25 years later to raise our third son, now eight years old, in Maine.  I am currently self-employed running a property rental business in Maine.

I write this letter to the court to give my personal support, and account of, my firsthand knowledge of Sam Patten.  I worked as a babysitter for more than five years for Sam and his siblings, arriving at his house after school, on week-end evenings, and as a live-in babysitter for two to four weeks at a time in Maine and Europe over two different summers and one winter holiday.

I have intimate and close knowledge of Sam during his early formative years, from about age six onwards, and feel I can provide relevant insight as to his character and person, as it was forming, leading to the adult who he is today.

As soon as I saw the news break, I reached out to Sam in order to lend my support.  I am glad that I am able to do so here.

I feel compelled to write because I have such positive memories of my time with Sam and his family.  Sam, in particular, was so striking because he was, recognizably as a child, exceptionally bright.  When I think of him, I see him on the back stairwell, off the kitchen, sitting on the stairs, book on his lap, head down, voraciously reading.

Sam was also exceptionally imaginative, and he and his siblings frequently played 'make believe', with Sam as the leader.  I cannot recall the content but there seemed no end to their ability to entertain themselves, and they were a close and happy crew, whom I took delight in supervising as I puttered about in the kitchen preparing a meal or tidying- up.

Sam, from a young age, showed interest in foreign cultures and customs.  I remember one instance, while traveling in France together, after a long walk around the the left bank in Paris, we all sensed that it was time to return back to the hotel.  Sam, wanting to practice his French, approached a man on the street who was passing by.  He duly asked directions, in French! I relate this incident as it shows how Sam from a young age demonstrated an intellectual curiosity in engaging with people and places that were different from his own.

Sam was, in sum, a well-behaved, delightful young boy. As he grew older and more independent, my time in his family home became more focused on looking after the younger siblings. But he remained, by turns, quiet and academic, and funny and entertaining. I genuinely enjoyed my time with Sam and his siblings, they were fun kids to be around who had highly intellectual parents and a good home. His parents raised him in a normal, down-to-earth manner, and he attended local public schools like the rest of the kids in town.

I was updated over the years as to his whereabouts, and learned, following his college graduation that he moved to Kazakstan. This came as no surprise to me that he would further his interest in international travel.

I reconnected with Sam and his family many years later on Facebook. I can honestly say that the connection with Sam on Facebook has reinforced my earlier interactions. His Facebook presence was at times academic, posting occasionally on politics and current events. He presented himself as conservative but centrist, with a wide following of friends, to a large extent friends in the print media who are employed by major magazine and newspaper outlets. He also very much showed his human side with loving photos of his wife, and his son, and his dog, Pepper. He took one trip, which I only witnessed via Facebook, to a monastery in the San Juan Islands in the Pacific Northwest. This was a special trip just with his son in order for his son to film a mini documentary about finding quiet amidst the noise all around us. His son is now pursuing film studies in college.

His dry sense of humor also exhibited itself with the occasional self-effacing, goofily endearing photos of himself such as wearing swimming goggles in a hot tub, wishing everyone a Happy Thanksgiving. He was really a friendly person to have around, and I miss his presence in that venue.

I am sorry that Sam's life work in helping to genuinely spread democracy in third world countries has intersected him with the current polarizing political situation in Washington. He has had to remain quiet and not defend himself from the many inaccurate stories circulating in print or on television news. It saddens me greatly to learn that he has lost his savings, his career, and has endured social isolation, and more worryingly, death threats. He has already paid a heavy price, and I hope that he will find a way forward out of this. I don't want to see the good, happy Sam I know, completely broken.

I beg the court to have mercy and judge leniently.

Respectfully yours,

Jennifer Wickenden

2

March 8, 2019

The Honorable Amy Berman Jackson
United States District Judge
For the District of Columbia
E. Barrett Prettyman United States Courthouse 333 Constitution
Avenue, NW
Washington, DC 20001

To Whom It May Concern:

My name is Corinne Graff and I currently work in Washington, D.C., as a foreign policy analyst. I have spent the past decade and a half working inside and outside of government as a national security expert, with expertise on U.S. foreign and global development policy toward crisis and conflict-affected states across the developing world. My spouse and I have three young children, and we are active members of our school communities.

I have known Laura Ballman Patten for 26 years, and I consider her one of my closest childhood friends. We met while doing a summer internship together in Newsweek's Paris Bureau, and since then have maintained a close friendship, which has solidified over the years as we have traveled together, lived in Washington together, and shared major life milestones together. Laura was a maid of honor in my wedding, and I was one in hers, and my children refer to her as "auntie Laura." I have known Sam Patten and his son from a previous marriage since before Sam's marriage to Laura in 2013. Since then and over the years, my spouse and I have socialized with both Laura and Sam as much as our busy family and work schedules have allowed, which has been on average at least several times a year.

I have known Sam to be a supportive and loving husband to Laura, and a loving and very engaged father to his son. When my spouse and I spend time with Laura and Sam, Sam frequently talks about his son, expressing clear interest and concern about everything from his son's school performance, to his hobbies and interests. It is clear from what I have seen of Sam's interactions with his son that there is little, if anything, he wouldn't do to support and offer the best that he can to his son, and equally clear that his son is thriving thanks to the loving support that he continues to receive from his dad. Likewise, it is clear that Sam is a gentle, kind, patient, and supportive husband to Laura, who has a high-pressure national security career. He is always affectionate and respectful toward Laura, and this is visible in his every gaze and glance at his wife, whom he clearly not only loves but admires. In addition, despite our political differences, Sam has always been not only civil but very respectful of my political views, and we have frequently engaged in candid and informative policy debates on a range of foreign policy issues over the years. In short, I know Sam

1

to be a devoted and loving father and spouse, a good friend to our family, and a kind and gentle person, an image that I have frequently found to be at odds with the reporting I have seen in the press in recent months.

Thank you very much for your time and consideration.

Sincerely,

Corinne Graff

12/7/2018

Robert M. & Elena V. Ames
████████████████████

The Honorable Amy Berman Jackson
United States District Judge
For the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, NW
Washington, DC  20001

Dear Judge Jackson,

Lena and I would like to briefly share with you the Sam Patten we know.  We have known Sam
for over 20 years, since the early years of our careers living and working in Almaty, Kazakhstan.
He was part of our close-knit group of expatriates  and local citizens that shared life's
experiences together, from professional activities and local business affairs, to holidays,
birthdays  and even weddings.

Currently I'm VP finance for Simmons Foods and Lena leads privacy for Medtronic.  Despite
our hectic schedules running children████(16) and ███(7) to piano lessons and friends
houses, we remain active in the community.  Lena created a 3,000 member strong fellowship
group of Russian speakers and leads a small team that helps Minnesota-based Russian-speaking
women in crisis find stability, and I volunteer with the local Yale alumni chapter.

In recent years we've been fortunate to see Sam, his wife Laura and son Max during their
regular trips back to Laura's hometown and our current city of residence, St. Paul, Minnesota.
We share discussions about mutual friends and current business pursuits, and more recently
have shared conversations related to Sam and Laura's struggles to adopt a child.

We're always happy to host Sam and his family.  We care a great deal about Sam, and he cares a
lot about his family and friends.  He's the kind of friend that's truly always available to share
his time and lend a friend a helping hand.  As an example, when my family and I were
travelling through Moscow in the mid 2000s to visit my wife's relatives Sam was the first to
offer a bedroom in his cozy apartment, splitting our two families between their two rooms.
That's the Sam Patten that we know so well.  Whether it's sharing his apartment, his advice and
counsel or just fellowship, Sam has been a good friend over the years.  I appreciate that
kindness he has shown our family.

I would be pleased and consider it an honor to speak personally to you about Sam's character or do anything you would ask of me that might help assist Sam in any way.

Sincerely,

Robert M. & Elena V. Ames

The Honorable Amy Berman Jackson
United States District Judge
For the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Jackson,

I am Sam Patten's stepfather. I have been with the family since 1987 when Sam was approximately 16. I had an opportunity recently to spend a week with Sam when his mother had a ruptured aneurysm and Sam came to Maine while she was in the ICU. This gave me a prolonged chance to be with Sam. I have never seen Sam so comfortable in his own skin. I thought that, in a strange way, this whole process involving the investigation and charges could turn out to be the best terrible thing to happen to Sam. I asked Sam if I could submit a letter to the Court with my thoughts of how he has evolved over the last year.

Sam built his entire professional life by himself. He did not use family connections for help, or even guidance in building his professional life. He felt the need to figure his future out for himself. He has essentially seen that professional life destroyed in the process of this investigation. He has no real idea of what his professional life will look like a year or two from now. Yet, he is at peace with himself. I believe that he has used this time to truly look at how he got into this situation.

I would think that, at times, he must have felt like he was a guy in the wrong place at the wrong time and that a conflagration broke out in the middle of his life. But what has impressed me tremendously is how he has sought to understand how his own choices and decisions put him in that wrong place. He could not control the wrong time, but I believe that he knows that he put himself in the wrong place and owns that responsibility.

This self-assessment and self-awareness was critical for Sam to arrive at an understanding that he needed to make some big changes in his life, specifically in connection with drinking. When one arrives at that understanding on one's own, the decisions made are more solid. I know this from my own experience when Sam's mother began attending AA thirteen years ago. I had to confront whether to try to stir the pot myself with ultimatums or whether to let her arrive at her truth. She did it on her own, picked up one white chip and didn't look back. I believe that Sam has reached that same moment.

Over the last few years, I thought that Sam's mother would be one of the last people that Sam would tell if he began to attend AA. I thought he would be afraid of failure and he would not want to tell her that he was going to try it unless he was already comfortable that he would follow through with it. Earlier this fall, Sam told his mother that he was attending AA meetings, that he enjoyed the program and found it very meaningful. This was a huge indicator to me that Sam had really bought into the process of living a sober life and did not fear that he was going to change his mind.

Our granddaughter wrote me a letter last Christmas "to be opened on a bad day". In that letter, she told me that "we are your family and we know who you really are." Sam's mother has always felt this way about her son. I know that she would always tell you that she loves her son unconditionally and that he is the most wonderful person on the face of the Earth. I also know that she is profoundly happy and relieved that Sam has discovered the AA program.

I know that you have a difficult decision whenever you sentence an individual and that you need to sort out the Court's different responsibilities in the sentencing process. I also know that one of the most important factors to consider in that decision is the potential for a defendant repeating the behavior or being otherwise involved in the criminal process in the future.

I am now retired, but in my career as an attorney I represented many criminal defendants and in the second half of my career I worked at the Maine Attorney General's Office and advised various professional licensing boards in connection with professional disciplinary matters. I had many opportunities to observe clients of mine before a court, or professionals in front of licensing boards that I represented as they explained that they had seen the error of their ways. For some, it was just talking the talk. For others, it was a very personal and genuine moment.

I can tell you from the bottom of my heart, and with absolutely no equivocation, that Sam has used the excruciating process that has confronted him for the last year to assess the direction of his life and "who he really is". I believe with complete confidence that he will never darken the door of a criminal courthouse again. I think that in some ways this has been the best worst experience of his life.

Sincerely,

Robert C. Perkins

December 18, 2018

The Honorable Amy Berman Jackson
United States District Judge for the District of Columbia
United States Courthouse
333 Constitution Ave, N.W.
Washington, DC 20001

Re: Sentencing of Sam Patten

Dear Judge Jackson:

I am writing to offer you a little more information about Sam than you might otherwise have, in the hope that you will consider it when you sentence him.

I am a member of the D.C. Bar, retired from my career as a corporate attorney but still active pro bono as General Counsel for the National Wildlife Refuge Association, headquartered in D.C. When we retired in 2010, my wife and I moved from the D.C. area to Lewes, Delaware, where I am in my fifth year on the City Council. In case my name rings a bell, I might mention

that from 1984 to 1989 I was an A.U.S.A.
in D.C., when you and your husband were
more senior and already distinguished in
the office.

I have known Sam's father, Bill Patten,
since we were in eighth grade together.
By the time we graduated we had
become close friends and spent most
of the following summer driving around
the country. Bill and I have stayed
in close touch ever since. So in a
sense I have known Sam all his life.

I didn't see much of him, though, until
his freshman year at Georgetown
University when of course he moved to D.C.
and his father asked me to counsel him.
One remarkable initiative of his there was,
after learning of the frequency of "date rape,"
to persuade Student Affairs to fund a
24-hour hotline for victims of that
and other forms of sexual violence.

Since Sam graduated I have stayed
in touch with him mostly through his

father but from time to time in person. When my mother died 12 years ago Sam wrote me a very kind note of condolence. As I have followed his life, I have admired him for forging his own career and trying among other things to promote democracy in some tough places.

Earlier this year, after Sam came under investigation, his father turned to me for advice and I offered to help in any way I could. Stuart Sears graciously accepted me as a lesser member of Sam's team, so again I worked closely with Sam.

You will have heard better discussions of the law and facts than I can frame, and you are already aware of the financial and emotional devastation he and his family have incurred. I would like to offer only my own perspective on Sam's character, based primarily on my experiences with him in a couple of

stressful times.

There is a consistent strain of idealism in Sam that includes setting high standards and holding himself to account when he fails to meet them. Over a long trajectory of time Sam has taken personal responsibility for his career, his family, and his choices, good and bad. I believe Sam has much to offer our country yet, and if you too feel that way I hope that in sentencing him you may be inclined to take his forthright character into account.

Thank you for considering this letter.

Sincerely yours,

Rob Morgan

November 29, 2018

The Honorable Amy Berman Jackson
United States District Judge
For the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Your Honor,

I have known Sam Patten a long time. I knew his grandmother, know his mother and father, and have known him, off and on, his whole life.

There are two words that spring to mind when I think of Sam: wit and integrity.

One thing that drew us specially together is our love for politics…and yes, we still do.

After graduating from Dartmouth College in 1980(with a degree in Chinese language), I went to work in New York for one year with Mobil Oil. The next year I returned home to Massachusetts and ran for public office, winning election to the Massachusetts Legislature where I was reelected 4 times…a Republican in a Democratic district. Though we now live in Vermont, I remain active in politics to this day.

In fact, I ran against Bernie Sanders in 2012 and Sam helped me in that campaign. This was the first time I had worked on the same project with Sam and I saw firsthand his talent for writing and his integrity. Campaigns for higher office are filled with ever changing circumstances, crises, incoming fire. Rarely is there calm. In all those challenges, in those myriads of decisions, Sam always chose the honorable path. I was not surprised as I knew him well. But I saw him up close, personally.

What went wrong here, I do not know. All I can say is that none of us are perfect. Each of us has made a mistake. Sadly, Sam seems to have made his on the periphery of a national crisis….and is now caught in the crossfire.

He has publicly (on Facebook) written to many of us saying that he did wrong and he is sorry for it. For someone like Sam this causes him great pain and suffering; for many others who know no shame, it would not. On top of this there is the extraordinary public humiliation which surely causes suffering for someone like him who cares so deeply about values of honor and character.

In addition to this public humiliation, Sam has suffered financially having liquidated his retirement to pay for his legal defense. Quite possibly his ability to land future business contracts has also been severely curtailed.

I hope that Your Honor will take all this into consideration when the time comes to determine his sentence.

Many thanks for taking the time to read this letter.

Sincerely yours,

John MacGovern

John MacGovern

# Mervin H. Wampold, Jr

███████

March 12, 2019

The Honorable Judge Amy Berman Jackson
United States District Judge for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Ave., NW
Washington, DC 20002

Dear Judge Jackson:

My name is Merv Wampold and I am writing this letter to attest to my friendship with Sam Patten. I only met Sam last August when he began attending meetings of Alcoholics Anonymous. I have had the pleasure not only to get to know Sam, but to also act as his sponsor in AA. As you are surely aware, it takes a lot of courage to join AA and to trust the people in the rooms with your experiences in life and with alcohol. The anonymity of AA allows all of us to speak openly, emotionally, and to trust that our shares will remain **confidential**.

I didn't know Sam prior to AA, but I have enjoyed getting to know him, to hear him share his story about his legal troubles as well as many other of his life challenges. Getting to know Sam, as his sponsor and as a new friend has been a joy for me. Most people think of AA as simply a path to address our problems with alcohol. Though that is the first and most important aspect, there is much more to be gained from attending meetings and participating the fellowship. We learn to own our past, improve upon our character, do the next right thing, find our higher power, make amends for our failings, and to live life on life's terms.

I am proud to say that I have been sober for over 11 years and have worked with many people in recovery with great joy seeing men and women get their lives back on track despite the troubles and wreckages of their past. Living one day at a time, admitting our shortcomings and mistakes, taking ownership, depending upon a higher power and aspiring to being a better human being.

I can personally attest that Sam has taken all of these things to heart and has been a committed and dedicated member of AA, working the 12 steps, fully participating in meetings and service work. Sam and I attend the same home group, plus several other meetings together on a nearly daily basis. We get together every Saturday, when our schedules allow, to work the AA program and to improve ourselves one day at a time.

Sam has shared his troubles openly with me and I sincerely believe he has not only owned the mistakes he has made, but more importantly is ready to be the best person he can be.  It has truly been a pleasure working with someone so open and prepared for the new adventures that lie ahead in his new life.

Sincerely

Merv Wampold, Jr

 **For Love of Children**

TEACH • EMPOWER • TRANSFORM

1301 Pennsylvania Ave. SE, Washington, DC 20003 • (p) 202.462.8686 • (f) 202.462.9280 • www.floc.org

The Honorable Amy Berman Jackson
United States District Judge
For the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Ave, NW
Washington, DC 20001

To the Honorable Amy Berman Jackson,

My name is Joshua A. Washington and I am a Program Coordinator for the Neighborhood Tutoring Program at For Love of Children, a non-profit in the District of Columbia. To provide some background, The Neighborhood tutoring program is a one-on-one tutoring program that teaches students foundational reading and math skills. With our 100% volunteer tutor base we help students in grades 1st-12th achieve grade level competency in these specific subjects. Students are guided though a structured curriculum at the pace that is appropriate for their individual learning, ensuring that while they build fundamental skills they also gain confidence in their ability to succeed. That is what Sam Patten has contributed to our organization on for our language program on Tuesday for the past 5 months.

Sam has consistently shown up to tutoring and worked with the same student since October, having only missed 2 programs as a result of his student calling out. He is dedicated and shows great concern for his student and always willing to step in to be a substitute for other students when needed. It has been an incredible pleasure working with Sam these past few months and I look forward to finishing out this year with him.

Joshua A. Washington

*J. a. Wash*

November 12, 2018

The Honorable Amy Berman Jackson
United States District Judge for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue NW
Washington DC 20001

Dear Judge Berman Jackson:

My name is Lauren Solnik and I am a happily retired federal employee, a former lay-leader in progressive Judaism and currently a grandmother of five. I offer this letter in support of Sam Patten, who has been my next door neighbor and stalwart friend for over a decade.

Sam and I share almost nothing in common – we are of different generations, we do not worship in the same manner, we come from vastly dissimilar backgrounds and we hold different world views. Yet over the past decade we have forged a deep and abiding friendship grounded in kindness and trust -- in an era when division and partisanship had already begun to break apart many friendships with far stronger ties.

Sam was a bachelor when he purchased the house next to mine on Capitol Hill. He settled in easily and entertained often between his frequent travels. His home became a salon of sorts in which all views were given fair airing, including mine. I came to know all of his immediate family members and a few of his friends, and I observed with detached amusement some of his on again/off again relationships with women. When Laura Ballman came into his life, it was clear that Sam Patten had found the love of his life. As a licensed marriage officiant, I was honored to conduct their secular wedding six years ago in Maine.

Since then, Sam's nurturing side has blossomed as he and his wife embraced the blending of their families. Sam's son Max became the central presence of their new lives, literally doubling in height and flourishing in school under their guidance. The addition to the family of Laura's niece, Georgia, brought them great delight, even as their own efforts to bear or adopt a child were unsuccessful when three separate birth mothers experienced changes of heart. I know that Sam agonizes over the effect his actions have on his son, now a college freshman. When I asked him what lesson Max should take from this, Sam replied, "When you mess up, own up." This is one of the valuable messages he also brings with him in his local volunteer work with at-risk youth because he firmly believes that moral compasses, including his own, can and must be recalibrated when they go off track.

Sam has taken full responsibility for the path he followed and is keenly aware of its consequences. As you consider what the next chapter of his life may hold for him, please know that he has the motivation and ability to achieve full and productive redemption. I believe his keen intellect and many talents can be focused on the greater good of society because I have benefitted from the countless random acts of kindness he has quietly and selflessly performed for me over the past ten years as my neighbor and my friend.

Please contact me if I can provide additional insight.

Sincerely

Lauren Solnik

# [SP] CONSULTING

The Honorable Amy Berman Jackson,
United States District Judge
For the District of Columbia,
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, NW
Washington DC, 20001

Your Honor,

My name is Irakli Alasania. I am Georgian politician, having served as Minister of Defense of Georgia in 2012-2014 and as Georgian Ambassador to the United Nation during Russian invasion of 2008. I currently work as a Senior Partner at DC based corporate consulting firm SP Consulting. Before joining the Cabinet in 2012, as a Chairman of liberal political party, the Free Democrats, together with other political organizations established the Georgian Dream Coalition and swept the 2012 Parliamentary elections in Georgia.

I had come to know Sam Patten as a political consultant during election campaigns in 2011-12. Our cooperation lasted couple of years. During these years, Sam has proven to be hardworking and dedicated professional.

Sam was very helpful to me in developing political strategies and social policies promoting inclusiveness, rule of law, protection of human rights and democratic transformation. I have been championing policies that were against Russian occupation of Georgia, and supported Georgia's Euro-Atlantic integration. Sam personally accompanied me on my trips and meetings with Georgian IDPs and refugees ethnically cleansed by Russian Forces from their communities. Sam demonstrated sincere empathy to Georgina people in dealing with political and humanitarian consequences of Russian occupation of Georgia.

Sam's work habits were always ethical and very transparent. Our cooperation went through some extremely demanding times of election campaigns; I can't recall any instance when Sam failed to be solid in his actions and sound in his council to me.

Many singlehandedly disregarded Sam's previous record and tried to demonize Sam's whole career, in the field of work in which Sam has been involved for some time. Some baseless statements find bigger audiences thus making authors tempting to be scandalous rather than truthful. My goal is to give accurate description of the experience me and my political party Free Democrats had with Sam Patten both on professional and personal level. I think he deserves to be treated fairly by those who he touched while working in Georgia.

Amb. Irakli Alasania
Senior Partner,

www.speonsulting.com

1729 King Street, Suite 100 Alexandria, VA22314

November 28, 2018

The Honorable Amy Berman Jackson
United States District Judge
For the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Laura Keyes Ellsworth



Dear Justice Jackson:

I am writing on behalf of Sam Patten. Sam and his wife Laura have both been close friends of mine for nearly 30 years. I believe Sam to be of strong character, with a genuine interest in making his community and the world as a whole a better place.

I met Sam in 1989 at Georgetown University where we both were part of an attempt to start a liberal student newspaper on campus. When we first got to know each other, I successfully lobbied to have Sam kicked off the newspaper because he identified as a Republican, so I considered him "subversive" to our purposes (there was already a conservative campus paper). Sam, however, took a more academic view of the exercise, believing he was an appropriate fit because his ideas were classically liberal. In the end, he was removed as an editor.

Despite this very inauspicious start, Sam and I developed a true friendship based on shared ideals and interests, even though our political views continued to diverge. After graduation, Sam and I both left the United States to work in countries of the former Soviet Union. I, as a journalist, and Sam with various NGOs. I know Sam was deeply enthusiastic about seeing the newly freed countries of the former Soviet bloc develop into flourishing democracies. While it is now my understanding his later business in the region meant he crossed paths with some unsavory characters, I don't have a shadow of a doubt that his work with politicians in that part of the world was still based on a genuine belief in free democracy.

My admiration of Sam is such that nearly eight years ago, I insisted my longtime friend Laura Ballman, who had been my roommate in Ukraine in the early 1990s and colleague in both Ukraine and Atlanta, Georgia, meet with him. Less than a year after the introduction, they were engaged to be married. I am happy their union has been strong and steadfast, despite the severe strains put on their relationship due to recent events.

As a journalist, I worked with several international news organizations including Bloomberg Television and CNN as a Senior Producer. I am currently based in Prague, Czech Republic, where I run my own corporate communications business. Watching the coverage of Sam's plea in the international press, including from some outlets for whom I used to work, has been incredibly frustrating, as I feel he has been grossly mischaracterized, and a lot of his activities misunderstood. It was part of what compelled me to write this letter on his behalf.

One of the odder things I noticed in the press coverage was an insinuation that because Sam had worked for Cambridge Analytica, he may have been a mastermind in using social media to manipulate elections. In fact, after his plea, Sam was trolled and ridiculed on social media. He had so little understanding of how Facebook worked that I actually had to explain to him via private message how to delete nasty posts from his own page.

My main purpose of this letter is to ask you to show leniency towards Sam. While I can't pretend to know his motivations for the mistakes he has made, I have known him and Laura long enough to know he is truly sorry for his actions, has taken full and total responsibility without excuses for his wrongdoing and has already suffered a great deal. He will no longer be able to work in his previous fields of employment, I know the financial burden of legal costs has been enormous, coupled with the fact his son has just started college. If not for Laura's employment, they would have surely lost their house.

Sam has also suffered great isolation in result of the public plea he made. Many who have known Sam and Laura for years have turned their backs on them, his inability to work gives him fewer outlets, and due to the aforementioned trolling on social media, he has had to close those accounts, leaving him little contact with people beyond his family. Despite this, Sam and Laura have both stayed amazingly positive, and kept their relationship intact. Both have mentioned they look for the silver linings to things. In that vein, they have separately noted that the events surrounding these charges led Sam to stop drinking, get fitter and look for things for which he is grateful. I think this speaks to a strength of character that is both rare and admirable. There is no near-term end to the stress Sam and Laura will both have to endure related to Sam's crimes, so I believe even with leniency there is still a price they will be paying.

Thank you for taking the time to consider my opinion and reference.

Sincerely,

Laura Keyes Ellsworth

21 December 2018

The Honorable Amy Berman Jackson
United States District Judge
for the District of Columbia
E. Barret Prettyman United States Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Jackson:

It is with a hint of sadness, but without an ounce of hesitation, that I write this letter in support of my friend, William Samuel Patten Jr. Without hesitation, because over half a lifetime of knowing Sam, I have always seen him act in all facets of his life with a commendable level of integrity, compassion, and honor. Sadness because it appears a momentary lapse of reason now threatens his family and livelihood after a career built on spreading democracy and defending US interests at home and abroad.

I shall begin with a little background information about myself. I am about the same age as Sam. I am a native of Washington, DC and attended college at Harvard University. I currently reside with my wife and newborn child in Moscow, Russia, where I work in the field of public relations.

Sam and I met almost exactly 22 years ago, at a party during the holiday season in Almaty, Kazakhstan, a city to which we had both recently relocated. We were two young professionals working in the spheres of public relations and public affairs. We were both only a couple of years out of university, taking on the dual challenges of learning our trade and adjusting to life in a strange and unique foreign land. Sam was working for a major American corporation, while I toiled for a non-profit US business and trade promotion organization.

Less than two years after that chance meeting, we had left those positions to work together to build the first home-grown but Western-style PR and public affairs consulting agency in Central Asia.  What struck me most about working with Sam was how much he cared for our clients, mostly US and multinational companies, and how concerned he was with the difficulties they faced in conducting business in the former Soviet Union.

The heightened scrutiny of being a foreign investor in Kazakhstan in the 1990s meant it was absolutely necessary to play by the rules and to operate in strict accordance with the law, despite the fact that the post-Soviet legal and regulatory framework was incomplete, often contradictory, and constantly evolving. Failure to navigate this minefield could result in negative publicity, monetary losses, or even the loss of assets. This was the environment in which the young Sam and I cut our proverbial teeth in the world of business.

At the same time, many businesses operating in the region at the time had to contend with massive corruption. Kickbacks and bribes were par for the course, whether to speed up the bureaucracy, to open up new opportunities, to gain advantage for one's business, or to mitigate the effects of failing to navigate the legal minefield I described above. Sam and I never played that game. In fact, we demonstrably refused to do. Sam advised our clients likewise to stay off that slippery slope. The course we set together then continues to guide me to this day.

In particular, I will never forget one incident in which Sam felt that a client, a major US company, was hell-bent on taking a course of action that would undoubtedly damage their business and their reputation in the country. Sam took the unusual step of blasting out one of his famous lengthy memos, addressed not only to our direct contact people but to the company's chairman, CEO and senior vice presidents back in the US. It was, to say the least, the nuclear option – destined to ruin our relationship with the client and to end our association with them and the stream of revenue they provided. Nevertheless, Sam stood on principle, believing it was more important express to them what he believed was the right thing to do to save their business.

One of the things that first drew me to Sam was our joint interest in the law. When we met, both of us coincidentally had ambitions of staying in Kazakhstan for one year and then returning to the US to attend Georgetown Law School.

That didn't happen, however, as we both laid down substantial roots in Kazakhstan, getting married and, in Sam's case, starting a family. We both became fixtures in the local business community and contributed to society on many fronts, including charity work. Sam's father-in-law was a journalist aligned with the political opposition, and it's important to note how Sam helped that gentleman flee persecution and seek asylum abroad.

Sam eventually returned to the US but we met again in Russia, to which we both moved in 2001. Sam had joined the International Republican Institute and came to take over their office in Moscow. In my mind, it was a perfect position for him, allowing him to employ his public affairs experience and keen political mind, while also advancing his interest in the development of democracy in countries which had limited or spotty experience with that form of government. It was through Sam that I met some of Russia's most interesting opposition political leaders. He wanted to play a role in making sure everyone had a seat at the table as the country emerged from its post-Soviet haze.

I was disappointed to see Sam leave Moscow a couple of years later, particularly because his next destination was an especially dangerous one! Sam felt he had a role to play in the formation of a new and vibrant democracy in post-war Iraq. Again, he put principle first, putting himself in harm's way to contribute to something positive.

Sam has had an interesting and varied career since those days and it would be wrong to say that I know or remember every detail of it. Messages from Sam could come from countries far and wide as he consulted leaders and parties around the world. I recall visiting him in Tbilisi, Georgia, where he was helping the ruling party (at that point, strongly supported by the United States) as they prepared for parliamentary elections. I recall hearing stories of a return visit to Iraq, where he conducted similar work. First and foremost, I know that Sam's work, both in consulting and for organizations like Freedom House, reflected his commitment to building democracy around the world and making a positive contribution.

On a more personal note, one of my most recent meetings with Sam was when he visited Moscow to attend my second wedding a couple of years ago. Late that night, after the festivities were over, we and a few others decided to visit the American-style diner where we'd spent so many weekend afternoons back in the early 2000s. It was a throwback to different times, and I could almost see Sam's son running up and down the aisles and wreaking havoc. Reflecting on it now, it recalls a few points about Sam, including his commitment to his family (he never left his son at home on weekend afternoons back in the old days) and his commitment to his friends (he and his wife traveled halfway around the world for my wedding).

Perhaps it is his loyalty – to friends, family and, in this case, to his client – that led Sam astray in the matter which is now before you. I am convinced he thought, right or wrong, that he was helping people. I know he sincerely regrets the circumstances and poor decisions that led him to this point. Moreover, I am aware that he has suffered immense consequences for his actions, on a professional and personal level, with those close to him and with the broader public.

Sam must now embark on a very difficult journey to rebuild trust with his family, his friends, his peers, his community, and his country. He has much to contribute on each of these fronts. I plead with you for leniency so that he can get started on that long road as soon as possible.

Sincerely,

John A. Mann II

Cambridge, MA
November 27th, 2018

Dear Judge Jackson,

My name is Caroline McCabe. I have a doctorate in clinical psychology and am employed in the Human Resources function of a major technology company where I have worked for the last 8 years. Late in the summer of 1993, while vacationing in Camden, Maine, an article in the local *Camden Herald* recounting the author's travels through war-torn Croatia and former Yugoslavia captured my attention. I was introduced to Sam Patten, the reporter in question, by a mutual friend. It was clear at the outset that we shared key values and a perspective on the human condition. A deep bond grew between us and I remained in Maine eventually finding my own work at the Institute for Global Ethics.

As the summer turned to fall, we shared many an afternoon chasing stories for the paper and eventually, as Sam moved toward politics, driving the state at all hours of the day putting up campaign signs and attending events. Sam's wit kept us laughing and his love of animals was appreciated both by me and my Golden Retriever. But what moved me most about my time with Sam, were the conversations and debates between us where his passion for improving the lives of those who were oppressed would leave me and others inspired, even when our views on how were divergent. He was simply committed to something larger than himself and that led him to consider an unconventional life path. He was not interested in settling down for a safe conventional career, instead he was clear that a life in the field and of service to democracy was his path.

My father, with whom he also got on well, helped Sam find his way to Kazakhstan which was one of the beginnings of his peripatetic life. From that time until now, I've spoken or emailed with Sam from many different continents following his travels and work with admiration. Sam's voice is a powerful one, and he often shares what others do not want to hear. For this he demonstrates courage. In the corporate world I conduct executive assessments for all senior leaders hired into a Fortune 100 company. We would describe Sam as a talented young leader dissatisfied with the status quo, who is willing to disrupt conventional thought. His perspective is broad, and he considers multiple opinions when forming his plans. His level of intellectual functioning is high and he has deep compassion for people, animals and the environment.

Sam always struck me as destined to have a positive impact on the world. You can imagine my surprise and dismay when this unfortunate lapse in his judgment landed him in the spotlight and has become the story line defining him. He always had a tough inner critic driving his excellence as a writer and I'm certain that inner reviewer is playing loudly now as he considers his future. Sam's written voice and perspective on events is one that all of us can benefit from. He pushes audiences to truly think and to consider more than we already believe we know. Today these qualities are much needed in public service if we are going to move beyond polarities.

In the corporate world, disruptive talents are known to hit bumps in the road, creating challenge which ultimately lead to an unfortunate outcome. However with reflection, insight and a growth mindset these individuals can and do become stronger and better leaders, driving extraordinary results. I'm convinced that this painful chapter in Sam's life is a similar learning event, albeit extremely serious, and that in the future he will reassert his voice from another avenue where his passions for democracy and compassion for people will prevail.

How he should be further punished for his failure to register as a foreign agent is a judicial question, not a personal one. But what I can say is that among the characters with whom he has now been associated, Sam stands out as incongruous when his motivations, values, and approach to his own predicament are considered. I can only hope that these will be factors in your decision.

Thank you for considering my input.

Sincerely,

Caroline F. McCabe, PsyD

David Satter

████████████████

October 21, 2018

The Honorable Amy Berman Jackson
United States District Judge
For the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Judge Jackson:

I am writing on behalf of Sam Patten, who now faces sentencing in the District Court having pleaded guilty to failing to register as a foreign agent. I have known Sam and his family for many years. I first became acquainted with his step grandfather, Joseph Alsop, in 1967 after I published an article on slum conditions in Chicago in The New Republic. I was a friend of Sam's grandmother, Susan Mary Alsop until her death in 2004 and became acquainted with Sam at Susan Mary's house in the 1990s. In subsequent years, our paths crossed not only personally but professionally. I am a former Moscow correspondent for the Financial Times (London) and now write books about Russia and the Soviet Union as well as commentary on Russia for the editorial page of The Wall Street Journal and for National Review. In 1995, Sam moved to Kazakhstan beginning a career in the former Soviet Union that was to span more than two decades. As a result, I came to know Sam not only as a friend and the son and grandson of friends but also a political actor in his own right who shared many of my concerns about an important but troubled region.

I regret that events have transpired in a manner that now can lead to a sentence for Sam but all people are broader than any specific error or misjudgment and I think it would be a mistake to ignore Sam's many contributions to improving the political and moral climate in Russia, Ukraine, Georgia and Kazakhstan over more than two decades. In 2001-04, Sam worked for the International Republican Institute in Moscow where, consistent with his mandate, he gave political advice to representatives of all of the Russian political parties. That advice was most relevant, however, in the cases of parties with a clear democratic orientation that were prepared to compete fairly for votes rather than rely on ballot stuffing and the use of administrative resources. One of the persons who benefited particularly was our close mutual friend, Boris Nemtsov, the leader of the Union of Right Forces (SPS) and a subsequent leader of the anti-Putin opposition who was murdered on February 27, 2015.

Boris Nemtsov was dedicated to bringing democracy to Russia. He was an early opponent of Russia's war in Chechnya and he fought to expose the Putin regime's corruption. He became a threat to Putin and his entourage and a likely, serious Presidential candidate. But an important factor in his success was the skills that he learned from Sam.

During his years in politics, as consultant, advisor, and aide, Sam did not have the reputation of someone inclined toward wrongdoing. On the contrary, besides his work at IRI, he worked for Maine Senator Susan Collins, and on democracy development for Freedom House and as an aide to Paula Dobriansky, the former Under Secretary of State. In these positions, his concern was to expand freedom and protect human rights in areas where they are frequently threatened.

As someone who has worked for more than four decades in the former Soviet Union, I can also point out that this is not a region for someone whose concern in life is personal luxury. Daily life is hard and frequently dangerous and success requires the ability to understand a complex and alien culture. The mere fact that Sam has been as dedicated as he has to a region with such deep problems attests to his intellectual and moral seriousness.

Whatever the sentence passed by the court, Sam will face the task of refocusing his life and moving forward, using the skills and experience that he has gained over many years. He should not leave politics because in my view, he still has an important contribution to make. I hope that an evaluation of Sam's life and career will argue for leniency and make it possible for him to return to work that is beneficial for him and to the region he knows and loves and also to our country.

Sincerely,

David Satter

Senior Fellow, Hudson Institute
Adjunct Professor, Johns Hopkins University School of
Advanced Academic Programs
Former Moscow correspondent, Financial Times of London

Author, The Less You Know, the Better You Sleep: Russia's Path to Terror and Dictatorship under Yeltsin and Putin; It Was a Long Time Ago and It Never Happened Anyway: Russia and the Communist Past; Darkness at Dawn: the Rise of the Russian Criminal State; and Age of Delirium: the Decline and Fall of the Soviet Union, all published by Yale University Press

The Honorable Amy Berman Jackson
US District Court Judge for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Judge Jackson,

I'm writing to you about my good friend, Sam Patten. My name is Richard
Spooner, and I worked for many years in the private sector in the former
Soviet Union, representing a US company first in Russia and then in
Kazakhstan, which is where I met Sam in the mid 1990s, when he was
working there for the International Republican Institute.

Sam was committed to what he was doing in Kazakhstan – working with
the government and parliament on developing laws to regulate political
parties, elections and NGOs, as well as ways to strengthen the rule of law,
which as you know were not areas where the newly independent states
inherited good practices or traditions from the USSR. We spent many an
evening talking about his interesting work in Kazakhstan. Sam took his
work seriously because, for as long as I've known him, he has been proud
of his country and those things about our system that are worthy of
emulation by people in other countries.

Back then Sam and I shared a sense of feeling good about helping the
Kazakhs stand up on their own two feet and shed the 'little brother' status
foisted on them by Moscow. The company I represented advised the
government on attracting foreign investment. Sam's organization advised
them on political issues. Of course, we both learned sometime before the
'90s were over that, both in Kazakhstan and in Russia, what came to
replace the Soviet system was not, unfortunately, about representative
government, transparency in business or respect for the rule of law.
Neither of those countries has ever had a democratic system, nor do they
seem close to having one. The bitter joke that Russians tell is that
"Democracy is when the wolves and the sheep get together and vote on
what's for dinner." Working in that world – with its rampant, systemic
corruption and absence of respect for the individual citizen – had the
effect of numbing me to the discrepancy between what I knew about right
vs. wrong, on the one hand, and what one needed to do in order to be
effective there.

I recognize that Sam, in his recent work as a lobbyist, made some serious mistakes, committing illegal acts. I would not presume to justify them by referencing the places or the people involved; I only want to say that in his previous engagements as a lobbyist, in numerous foreign countries, Sam's assignment was always about helping a local politician or politicians succeed by advising them on how to run their campaigns or perform their duties in a way that better resembled the practices and standards of Western democracies. Sam cares about his country, and has been, I believe, until his recent bad judgments, a good unofficial ambassador. He has taken his conviction hard, as he should, of course, and now he has to answer for the mistakes he's made. But Sam is a good person. I ask you, if you think it would be right, to show him lenience.

With Respect,

Richard Spooner



**ST. JOHN'S CHURCH**
LAFAYETTE SQUARE

March 19, 2019

The Honorable Amy Berman Jackson
United States District Judge
For the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Jackson,

My name is the Reverend D. Andrew Olivo and I am a priest on staff at St. John's Episcopal Church, Lafayette Square, in Washington, D.C. We are an active community of faith with parishioners from all around the Washington metropolitan area.

I can tell you that Mr. W. Samuel Patten and his wife, Laura, are members in good standing at St. John's Church, which, in the Episcopal Church, means that they are active in corporate [Sunday] worship, and that they work, pray, and give to the parish.

Additionally, I have had several opportunities to meet with Mr. Patten for individual pastoral counseling since his guilty plea in the fall of 2018, and I know that he continues to seek out ways to make amends in his personal life, to be supportive of his family during this difficult time, and to serve the community.

Sincerely yours,

The Rev. D. Andrew Olivo,

Assistant Rector

**SUSAN J. FIESTER, MD**
**Psychiatry, Forensic Psychiatry**

January 9, 2019

Stuart A. Sears, Esquire
Schertler & Oronatro, LLP
901 New York Avenue, NW, Suite 500
Washington, DC 20001

Re: William Patten

Dear Mr. Sears:



████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

Sincerely,

Susan J. Fiester, MD

**William Samuel Patten, Jr.**

███████████████████

**Washington, D.C.  20002**

March 28, 2019

The Honorable Amy Berman Jackson
United States District Judge
for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue NW
Washington DC 20001

Your Honor,

I am writing you in advance of your sentencing me in the event I should stumble or forget what I'd like to say.

The crimes that I committed are a source of great shame and regret for me.  I acted as if the law did not apply to me and that was wrong.  I am very sorry, and I should be punished for this.

In the eight months since I pleaded guilty before you, and more than a year since this journey began for me, I have changed.  To an even more meaningful degree than the day the FBI came to my door, I have surrendered.

In my life, I have tried to do the right thing, but there have also been times that I have failed – none more poignantly than the circumstances that bring me before you.  First I tried to justify and excuse my conduct, but now that's over.  I accept complete responsibility for what I have done.

For me, the last year has been very dark.  There has been the public humiliation that comes with the letter F stamped on your chest, financial disaster, grief for my family and many sleepless nights.  But in admission and surrender, I have also come to know a certain peace.  No matter how pervasive the darkness of the last year has seemed at times, I remind myself of the many times I have tried to serve the light, and hope that I might have additional chances of doing so.  In this hope, I have found abiding comfort.

This has required me to reject the salve of victimhood, and its attendants: self-justification and self-righteous anger.  That is not easy, especially in the environment in which we all inhabit today.  But for me, it is an existential challenge.  For me, slipping into the role of a victim means I am destroyed.

People have not done things to me. I could have registered under FARA for my
Ukrainian client the moment my efforts to serve him triggered the registration
requirement.  Instead of withholding some emails from the Senate Intelligence
Committee, I should have submitted all of them regardless of whether I thought I
was telling them enough, or whom I sought to protect from their disclosure.
I could have told my client "no," when he asked me to buy him tickets to the
Inauguration party, but I was too eager to please and I broke a rule in doing so.
These are all choices – wrong choices – that I alone made.

For me this has been a journey.  Not a journey I would recommend to others, but
one from which I have derived unintended benefit.  Not profit, not glory, not,
perhaps, freedom, in the immediate sense.  Along this road, I have found renewed
reverence for ownership, and an appreciation for the fact that responsibility is not a
cousin who visits on holidays, but the quiet presence that is always there, even
when no one is looking.

Respectfully yours,


I am sincerely,



William Samuel Patten, Jr.